[No. 30699. Department Two. March 24, 1949.]

IVER H. ZARBELL, *Appellant,* v. LOUIS MANTAS *et al.,*
*Respondents.*[1]

*Melvin T. Swanson,* for appellant.

*Oscar A. Zabel* and *Philip J. Poth,* for respondents.

ROBINSON, J.—This case concerns liability in connection
with a conditional sales contract to purchase a 1935 Chevro-
let sedan. The price was $495, and when insurance, record-

[1]Reported in 204 P. (2d) 203.

ing fees, transfer fees, and the cost of a credit report were added, the total contract price was $570. The sum of $150 was paid down, and the balance of $420 was payable in installments of thirty-six dollars on the ninth day of each month, beginning with January 9, 1947. No installment payments were made, and the entire unpaid balance of $420 is due and payable.

This action was brought in the superior court by Iver H. Zarbell, the assignee of the contract, against Al Leaper and Louis Mantas, and against the marital community of Mantas and wife. Judgment was rendered against Leaper and Mantas individually, but the community of Mantas and wife was dismissed from the action. This appeal was brought from the judgment dismissing the marital community.

The facts, in so far as they may be ascertained from the rather scanty and conflicting evidence appearing in the record, are as follows: The car was purchased from Farrell's Automotive Service. An unidentified individual or individuals (there is confusion in the testimony on the matter) appeared at the Mantas home with a copy of the contract of sale. Leaper, who is Mrs. Mantas' brother, lived with Mr. and Mrs. Mantas, and was present on this occasion; he was the first signatory to the contract. The contract was presented to Mrs. Mantas for her signature. She refused to sign. It was then presented to Mantas. Although his wife and daughter urged him not to sign, he did so. Under the dotted line on which his name is written, as well as under the line on which Leaper signed his own name, is the printed word "Purchaser." Earlier in the contract, the following appears:

"KNOW ALL MEN BY THESE PRESENTS: That FARRELL'S AUTOMOTIVE SERVICE of Seattle, King County, State of Washington, hereinafter designated as the Seller, being the owner of, has delivered to AL LEAPER and Louis Mantas, residing at 4323 Burke, Seattle, County of *Wash.*, State of Washington, hereinafter designated as the Purchaser, the Personal property, goods and chattels above described, . . ."

On the reverse side of the contract is an "Acquaintance Blank," containing space for certain information, preceded by the words, "In order to induce the granting of credit, I make the following statements, which I warrant to be true," and concluding with the words, "The above statement is submitted as a basis for obtaining credit, and I hereby certify it is a true account of my financial position." This blank is filled out and signed by Leaper alone. From it, it appears that Leaper had at this time a job paying fifty-four dollars a week, but that he was in possession of no assets.

Appellant contends that, on its face, the contract indicates that Mantas signed as copurchaser with Leaper. From this, he argues that the case is brought within the rule of *Bellingham Motors Corp. v. Lindberg*, 126 Wash. 684, 219 Pac. 19, *Page v. Prudential Life Ins. Co.*, 12 Wn. (2d) 101, 120 P. (2d) 527, and other cases, to the effect that the husband, being by statute the manager of the community personal property, may make contracts to buy or sell such property, and that these contracts will be binding on the community, even though signed over the objections of the wife.

Respondent Mantas, on the other hand, avers that all parties to the contract understood that he signed the contract, not as a copurchaser, but purely as an accommodation party, and that the community in no way benefited, or was intended to benefit, from his signing. In this situation, he argues that the community cannot be bound.

At the outset, a serious point must be considered, as to whether, under the parol evidence rule, testimony tending to prove that Mantas signed the contract in another capacity than that indicated on its face, may be admitted. The matter is in a state of some confusion. See 32 C. J. S. 960, Evidence, § 985 (d), and cases there cited. The weight of authority, however, seems to be with the Oregon court, which observed, in the case of *Lovell v. Potts*, 112 Ore. 538, 207 Pac. 1006, 226 Pac. 1111:

"When the parties to a contract know that one of the parties thereto is a surety, such fact may be shown by parol."

See, also, 9 Wigmore on Evidence (3d ed.) 122, § 2438.

Nevertheless, particularly in view of our own case of *Karatofski v. Hampton,* 135 Wash. 139, 237 Pac. 17, we are not prepared to state that there could not be a contract so explicit in its definition of the character of the parties signing it that parol evidence would be inadmissible to qualify it. It is not necessary to so hold here. Although both parties signed as "purchasers," the acquaintance blank, on the reverse side of the instrument, is filled out only with reference to the credit standing of Leaper, and is signed by Leaper alone. From this, an inference may be raised that the two parties did not in fact stand upon an equal footing as copurchasers; and parol evidence may be admitted to explain their true relationship, "in order that the intention of their contract might be found and its ambiguity resolved." *Randall v. Tradewell Stores,* 21 Wn. (2d) 742, 153 P. (2d) 286.

██ We turn now to a consideration of this evidence. All the witnesses agree, not only that Mrs. Mantas refused to sign the contract, but that Mantas signed it over her objection. Mantas testified that at first he himself refused to sign, and finally did so only after repeated urging, both by the bearer of the contract and by Leaper. He further testified that he had not gone with Leaper to buy the car, and that he did not see it until two days after he had signed. He stated that neither he nor his wife could drive, and that, after Leaper had acquired the car, he only rode in it "a couple of times." Mrs. Mantas also testified that her husband could not drive, and that she herself "wasn't more than twice" in the car. On questioning by the court, she testified as follows:

"THE COURT: What reason did the brother give to you or to your husband for asking him to sign this contract? A. He didn't give no reason. He just told him it had to be signed by someone, that's all, and he just asked him to sign it. THE COURT: Did he suggest to your husband that he had some interest in the car? A. No."

Mrs. Delarose, the Mantas' daughter, testified to this effect:

"Q. What was said with respect to who was buying the car that evening? . . . A. Well, this fellow that came to the house said that Alfred Leaper was buying the car and he must have someone sign it before he could get the car, or before he could get the contract."

To offset this testimony, there is presented, in addition to the contract itself, only the statement by Mr. Zarbell, to the effect that insurance on the car was taken out in the name of both Leaper and Mantas. It is true that appellant states in his brief: "The certificate of title would have to be issued with the name Mantas on it," but the certificate was not presented in evidence, and we see no reason to agree with him in this conclusion. Persuasive though appellant's evidence is, therefore, it is our opinion that the testimony delineated above, when considered in connection with the fact that the acquaintance blank was made out in Leaper's name only, is sufficient to counteract it, and to show that Mantas signed the contract, not with any intention of acquiring an interest in the car, but only as an accommodation to his brother-in-law.

█ It has long been well-settled law in this state that community property is liable for a suretyship debt of one of the parties only if the community has been benefited by the suretyship obligation. "Creditors' Rights in Community Property," by Frank L. Mechem, 1 Wash. L. Rev. 80, 87. The original reason behind the rule was set forth in the early case of *Spinning v. Allen,* 10 Wash. 570, 39 Pac. 151, as follows:

"The Code (Gen. Stat., § 1413) expressly provides that neither spouse shall be liable for the separate debts of the other. When the community is not liable for a debt contracted by the husband concerning his separate property, for which he receives a consideration, how can it be said that the community should be held for a debt contracted where there was no consideration received or implied, moving to either the husband separately or to the community, as in the case of a suretyship where the consideration moves, and is intended to move, entirely to a third party? Certainly there can be no presumption in any way that the community is or could be benefited by the husband's becoming a surety."

On occasion, of course, it can be clearly demonstrated that the community has benefited by reason of the husband's becoming a surety; and, in such cases, liability has been enforced against the community property. An example may be found in the long line of cases beginning with *Horton v. Donohoe Kelly Banking Co.*, 15 Wash. 399, 46 Pac. 409, 47 Pac. 435, *Allen v. Chambers*, 22 Wash. 304, 60 Pac. 1128, and *Shuey v. Adair*, 24 Wash. 378, 64 Pac. 536, holding that a suretyship obligation, incurred by a married man for the benefit of a corporation in which he is a stockholder, is a community obligation, if the corporate stock is the property of the community. The test remains, however: Was the transaction carried on for the benefit of the community? *Way v. Lyric Theater Co.*, 79 Wash. 275, 140 Pac. 320; *Sun Life Assurance Co. v. Outler*, 172 Wash. 540, 20 P. (2d) 1110. If not, the community may not be held liable. *Case Threshing Machine Co. v. Wiley*, 89 Wash. 301, 154 Pac. 437; *Kanters v. Kotick*, 102 Wash. 523, 173 Pac. 329; *Spokane State Bank v. Tilton*, 132 Wash. 641, 233 Pac. 15; *Peterson v. Zimmerman*, 142 Wash. 385, 253 Pac. 642.

It is reasonably clear, we think, that no benefit accrued, or was intended to accrue, to the community of Mantas and wife by reason of the transaction involved in this case. This conclusion must, of necessity, rest on the same evidence from which it has been determined that Mantas did not sign the contract as a purchaser. Neither Mr. nor Mrs. Mantas could drive. Mr. Mantas did not use the car in his business. The fact that Leaper was allowed to keep it rent-free in the Mantas garage, much stressed by appellant, appears to have little significance, in view of the family relation of the parties and the further circumstance that Leaper was living with the Mantas, who quite obviously had no other use for their garage, at the time of the purchase. Certainly, the mere fact that Mr. and Mrs. Mantas rode in the car "a couple of times" is not sufficient to warrant a finding that Mantas was acting for the benefit of the community when he signed the contract.

The trial court rightly dismissed the marital community, and the judgment from which this appeal is taken must, therefore, be affirmed. It is so ordered.

MALLERY, SCHWELLENBACH, and HILL, JJ., concur.

SIMPSON, J. (concurring in the result)—I concur in the result. In so doing, I wish to point out the following: No questions relative to the introduction of oral evidence were presented at the trial, nor is that issue in any way raised in the brief. The court's statement at the close of the trial indicates the basis for the judgment. It is:

"The control of personal property of a community, which is of course given by statute in a measure into the hands of the husband, is a rather interesting question. I have had several problems of the kind before me, and I am not prepared to say that the control of the husband is so absolute that where he is operating in contact with people who are dealing with him and his community and the woman disclaims, the wife disclaims her willingness to participate, that that does not exclude any thought of the law of controlling or controlling the issue as to the liability of the community. I have taken a contrary view, and I don't see any reason to change it here.

"The contract itself speaks for itself. It is a written instrument. According to the evidence before me, it was brought before these people and signed there, and one party of the community refused to sign. She said she would not and advised her husband not to do so, so it remains to me a contract made by the one party to the community."