[No. 1777-3. Division Three. February 27, 1978.]

CARL B. WARREN, ET AL, *Respondents,* v. WASHINGTON TRUST BANK, *Appellant.*

*Robert H. Whaley, P. H. Winston,* and *Winston & Cashatt,* for appellant.

*William D. Symmes, Eric K. Nayes,* and *Witherspoon, Kelley, Davenport & Toole,* for respondents.

McINTURFF, J.—Both parties appeal from a judgment that defendant Washington Trust Bank misapplied funds received from a debtor to obligations other than that upon which the plaintiff Carl B. Warren was bound as a surety. The facts are extremely complicated and involve a series of transactions between family members and the bank.

The plaintiffs, Carl B. and Vena E. Warren, are the parents of Geraldine J. Walters, the wife of Charles E. Walters. The Walters were third–party defendants at trial, but are not parties to this appeal. The principal defendant is Washington Trust Bank who is appealing from a judgment that it converted a certificate of deposit in Mr. Warren's name.

In 1967, Walters was a director, vice–president and part owner of Electric Smith Construction and Equipment Company (ESC) which had entered into a contract with Reynolds Metal Company for about $1.4 million. ESC had secured a $300,000 line of credit with the bank and was drawing heavily on it to meet the Reynolds contract.

Early in 1968, Reynolds cancelled the contract, and at that time ESC owed the bank $375,000. ESC had expended most of that money on the contract; thus, the bank considered its loans to ESC to be in jeopardy. The money had been advanced on 90–day notes which were soon coming due, and the bank did not want to advance more money. However, the bank advised ESC that if it would raise funds sufficient to reduce its obligations· to $250,000, the bank would carry a line of credit in that amount for a year. It was determined that $150,000 would be required, part of which would be working capital for the firm. It was proposed Walters borrow that amount by having his father–in-law, the plaintiff Warren, furnish cash security for the loan. The following transactions then occurred:

1. On January 12, 1968, Warren made his check for $150,000 payable to the bank. Walters told him at that time

that he could expect the money back in about a year, at the conclusion of litigation over the Reynolds contract.

2. To accomplish the $150,000 transfer to ESC, a time certificate of deposit for that amount, payable to Warren, was issued by the bank to evidence his check deposit. It was endorsed by Warren and retained by the bank.

3. The bank prepared a promissory note payable to Warren with Walters as the maker. It was endorsed in blank by Warren and given to the bank.

4. The bank prepared for Warren a possessory collateral security agreement and a receipt for collateral.

5. Then, the bank issued its cashier's check for $150,000 payable to "Charles E. Walters and C. B. Warren" and delivered the check to Walters, who noted on the back of the check "for deposit only" and endorsed both his and Warren's names.

6. Walters then deposited the check in his personal account at the bank, drew a check payable to ESC for $150,000 and deposited that check in the ESC account.

In the end, the transactions reduced ESC's outstanding obligation to the bank to $250,000 and provided ESC with working capital. ESC subsequently executed and delivered to Walters a note for $150,000 payable solely to him to evidence his check to the company. About 20 months later, August 1969, judgment was entered in the Reynolds suit in favor of ESC. Reynolds appealed. Meanwhile, the original note was renewed and when subsequent notes became due and were not paid, they too were renewed with the last being on April 7, 1971.

Obviously, a great deal depended upon the success of ESC in its litigation. To further secure its outstanding obligations ESC assigned to the bank its judgment proceeds against Reynolds on April 10, 1970. Two months later, ESC also assigned some of the judgment proceeds to Walters to secure the payment of the note ESC gave him in consideration of the loan generated by Warren's deposit. In October 1970, Walters assigned to the bank the ESC note to him

along with the assignment of the judgment proceeds securing the note. These assignments from Walters to the bank secured the obligations of the Walters community to the bank.

The situation brightened when the judgment was affirmed and Reynolds paid to ESC $395,284.64 on April 16, 1971. After payment of $75,000 to ESC's attorneys for fees and costs, and payment of $230,000 to the bank on the balance owing by ESC, there remained to be applied on the note from ESC to Walters, which he had assigned to the bank, the amount of $89,000. By this time, the amount of that note had been reduced to $116,000 because of chargebacks against Walters for personal services rendered by ESC to him leaving a $27,000 balance.

On April 29, 1971, and May 4, 1971, Walters directed in writing, on forms prepared by the bank, that the $89,000 be applied as follows: $75,680 to the payment of his personal obligations at the bank; $5,250 to be applied as prepaid interest to the last line of notes to the bank on which Warren was an endorser; and $8,489 in cash by way of a cashier's check which he directed to be made payable to ESC, Walters and the Old National Bank. The $27,000 balance owing by ESC on its note to Walters, which had been assigned to the bank, was paid by ESC to the bank by note made payable to Walters.

After completion of the above transactions, the only money owed to the bank was the $150,000 arising from the original note of January 12, 1968, on which plaintiff Warren was an endorser. On September 29, 1971, Warren and Walters were advised by letter[1] that the bank intended to

---

[1]That letter stated:

"REGISTERED MAIL

"Mr. C. B. Warren
"North 12515 Fairwood Drive
"Spokane, Washington 99218

"Dear Mr. Warren:

"We are holding a note dated April 7, 1971, in the amount of $150,000 which is

rely on the certificate of deposit to pay off the loan. On October 7, 1971, when the note became due and was not paid, the certificate of deposit was applied to the indebtedness, the note was marked cancelled, and it was surrendered to Walters, the primary obligor.

The court found that the Warren community was benefited by the husband's pledge to the bank and that they received consideration for his undertaking on the note. The court also found that the bank did not convert the cashier's check upon which Walters signed Warren's name and that the statute of limitations precluded any claim in that matter. It was also found that the bank did not discharge the Warrens by cancelling and surrendering the note nor were they discharged by the bank's release of collateral to Walters. However, the court found the bank breached its duty of good faith and fair dealing to Warren, the surety, by misapplying the judgment proceeds from the ESC–Reynolds case to Walters' obligation rather than to Warren's obligation as surety on the note. Judgment in the

---

due October 7, 1971. This note is to the order of C. B. Warren and is signed by Mr. Charles E. Walters. The note is endorsed over to the Washington Trust Bank. Interest on this note has been paid through October 7, 1971. Please find a copy of the note enclosed.

"As security for this note, the Washington Trust Bank is holding a time certificate of deposit in the amount of $150,000 which is due October 7, 1971.

"On October 7, 1971, it is our intention to convert the $150,000 time certificate of deposit into cash and pay the $150,000 note. The interest which has accrued on the $150,000 certificate of deposit will be mailed to you in the form of a check. This check will be a Washington Trust Bank cashier's check and drawn to your order in the amount of $3,750.

"If you have any questions, please give me a call.

"Very truly yours,

"T. L. Perko
"Vice President

"TLP:scm
"cc: Charles E. Walters"

sum of $114,500.90 was entered against the bank, and judgment of indemnity in the same amount was entered in favor of the bank against the Walters community.

## I. THE APPEAL OF THE BANK

The primary issue raised by the bank on appeal is whether the court erred in applying Restatement of Security § 142 (1941)[2] by finding that the bank, a creditor, misapplied the judgment proceeds from the ESC–Reynolds suit to the personal obligations of Walters instead of to the obligation upon which Warren was a surety.

First, the bank argues that the court erred in finding that Warren was a surety upon the note he signed as an endorser. The bank contends the language on the face of the note precludes a finding that Warren was a surety because it provided anyone signing the note declared himself "bound thereon as a principal, and not a surety." The bank argues that since Warren agreed to bind himself on the note as a principal, he cannot object to the failure of the bank to seek recourse from another party (Walters) or to its applications of Walters' collateral to other debts. In

---

[2] "Application of Payments to Creditor.

"Where the creditor has claims against the principal other than that upon which the surety is bound, payments to the creditor are applied according to the following rules:

"(a) Subject to rules stated in Clauses (c) and (d), where the principal makes a payment from his own funds, the creditor must apply the payment in accordance with the intention manifested by the principal at or before the time after the payment; or

". . .

"(c) where the principal makes a payment with funds obtained from the surety or on the credit of the surety for the purpose of making payment on the debt for which the surety is bound, the payment, irrespective of the principal's directions, must be applied by the creditor to the satisfaction of his claim against the principal for which the surety is liable, if the creditor knows of the source of the principal's payment either at or before the time of payment, or subsequently before the creditor has changed his position;

"(d) where a principal makes a payment to a creditor with funds arising out of a contract for which the surety is bound, the rules as to the application of payments are not affected by the fact that the creditor is aware of the source of these funds, unless the principal has contracted with the surety as to the application of such funds and this fact is known to the creditor;"

reply, Warren argues the bank is mistaken in its analysis of primary versus secondary liability on a negotiable instrument and the relationship between those liabilities and the suretyship status of an accommodation party. He contends principal liability has nothing to do with the fact that one who signs a note as an accommodation maker is still a surety.

RCW 62A.3–415 provides in pertinent part:

(1) An accommodation party is one who signs the instrument in any capacity for the purpose of lending his name to another party to it.

(2) When the instrument has been taken for value before it is due the accommodation party is liable in the capacity in which he has signed even though the taker knows of the accommodation.

(3) As against a holder in due course and without notice of the accommodation oral proof of the accommodation is not admissible to give the accommodation party the benefit of discharges dependent on his character as such. In other cases the accommodation character may be shown by oral proof.

Official Comment 1 to that section makes it clear that an accommodation party is always a surety, and "it is his only distinguishing feature." The suretyship obligation of the accommodation party is different from that of other sureties, the comment explains, "in that his liability is on the [negotiable] instrument and he is a surety for another party to it." The comment provides further:

His obligation is therefore determined by the capacity in which he signs. An *accommodation maker or acceptor* is bound on the instrument without any resort to his principal, while an *accommodation endorser* may be liable only after presentment, notice of dishonor and protest.

(Italics ours.) Official Comment 1, RCWA 62A.3–415.

As 2 F. Hart & W. Willier, *Bender's Uniform Commercial Code Service* § 13.03 (1976) states at page 13–10:

Equally confused and misleading has been the use of the terms "secondary" and "primary" with reference to contractual liability and to the suretyship transaction. In the suretyship sense, "secondary" simply refers to the

fact that the obligor rather than the surety *ought* to pay or perform; hence, his obligation is "primary" and the surety's "secondary." However, in a contractual sense, "secondary" refers to conditional liability, i.e., conditions precedent to the promisor's duty of performance, while "primary" refers to an unconditional or absolute duty to perform. *Thus, a surety is always "secondarily" liable in the suretyship sense, but he may be either "primarily" or "secondarily" liable in the contractual sense, depending upon the terms of his agreement with the obligee.*

(Footnote omitted; italics ours.)

█ Thus, if Warren is considered an accommodation *maker,* then he is "primarily" liable in the contractual sense upon the note he signed. If he is considered an accommodation *endorser* he may still be considered "primarily" liable on the contract because the language on the face of the note provides that each party signing it declared himself "bound thereon as a principal, and not a surety." That is the sense of the cases cited to us by the bank.[3] While he may be "primarily" liable on the instrument in the contractual sense, he may also be a surety and secondarily liable in that sense.

The bank argues, nonetheless, that an accommodation party can waive his surety rights by agreement, citing RCW 62A.1-102(3) which provides that the provisions of the UCC may be varied by agreement. Since Warren signed a note which said that he declared himself bound upon it as a principal and not as a surety, the bank argues that he agreed by the plain language of the instrument to bind himself in such a manner. The question, then, is whether, by the language on the note, Warren and the bank so altered the provisions of RCW 62A.3-415 as to deny him the status of suretyship.

[3]*American Bank of Commerce v. Covolo,* 88 N.M. 405, 540 P.2d 1294 (1975); *Vinick v. Fourth Nat'l Bank,* 531 P.2d 327 (Okla. 1974); *Meadow Brook Nat'l Bank v. Recile,* 302 F. Supp. 62 (E.D. La. 1969); *Downie v. Cooledge,* 48 Wn.2d 485, 294 P.2d 926 (1956); *W.F. Brown & Sons, Inc. v. Easterly,* 4 So. 2d 73 (La. App. 1941).

The full text of the sentence which is alleged to constitute the waiver reads:

Each and every party signing or endorsing this note hereby waives presentment, demand, protest and notice of non–payment thereof, and declares himself bound thereon as a principal and not as a surety. If there be any default under any Security Agreement between the undersigned and the Washington Trust Bank, this note shall become due at the option of the holder hereof.

For two reasons, it is difficult to construe that sentence as a waiver. First, it appears only to remove those conditions precedent to an endorser's primary liability upon a negotiable instrument. *See* UCC § 3–501. Secondly, it does not clearly provide for a waiver of suretyship status as to the underlying agreement between Warren and Walters. It requires only that anyone signing the note be bound *to it* as a principal. Construing that sentence as a waiver of a valuable suretyship right as to the underlying obligation and transaction evidenced by the note would be unreasonable and not in keeping with the views expressed behind the adoption of RCW 62A.3–415. *See Rose v. Homsey,* 347 Mass. 259, 197 N.E.2d 603 (1964). Furthermore, there is sufficient evidence in the record that Warren signed the note for the purpose of lending his name to another party to it. That is enough to make him an accommodation party under UCC 3–415(1) and, as such, a surety under Official Comment 1 to that section.

Thus, by waiving presentment, demand, protest and notice of dishonor, and in accordance with the language on the face of the note, Warren became primarily liable on the note in the contractual sense. The bank could have looked to him for payment of the note in full. In addition, by his signature on the note and from all of the oral evidence, he was an accommodation endorser and a surety to his son–in–law, Walters. Therefore, he was a surety secondarily liable in the sense that Walters should have paid the promissory note his father–in–law endorsed as an accommodation party.

Since it could have looked to Warren to pay the note in full, did the bank err in applying the judgment proceeds— received through the assignment by Walters—to his personal obligations at the bank, as he directed, instead of to the note upon which Warren was a surety?

Having found a "special equity" for Warren in the proceeds, the court applied subsections (c) and (d) of the Restatement of Security § 142 (1941), see footnote 2, and awarded to the Warrens amounts representing the judgment proceeds securing the note from ESC to Walters and the deficiency note executed by ESC to Walters to make up the difference.

The bank contends that neither subsection is applicable because the funds were neither "obtained from" nor on the "credit of" nor "for the purpose of making the payment on the debt for which" Warren was bound. Restatement of Security § 142 (1941). Also, the bank argues that the funds were not "arising out of a contract for which the surety [was] bound." Restatement of Security § 142 (1941). Therefore, it contends that the general rule[4] authorizing the creditor to apply funds in accordance with the debtor's direction be applied and the court's judgment reversed in the above amount.

The bank argues as to the application of subsection (c) that the funds applied to Walters' personal obligations at the bank were not loaned to him by Warren, nor were they obtained upon the credit of Warren. The bank contends that they were strictly funds arising out of the fortuity of the litigation between ESC and Reynolds and used in partial payment by ESC to Walters for a loan made by him to the company.

And, as to the application of subsection (d) the bank contends that funds paid by a principal to a creditor, in order to be applied to the obligation upon which the surety is bound, must arise out of the *very* contract for which the

---

[4]*See* Restatement of Security § 142(a) (1941); A. Stearns, *Suretyship* § 7.23 (1951).

surety is bound to make payment. In other words, it asks for a strict interpretation of that subsection.

We agree with the bank. We do not stretch the meaning of the Restatement of Security § 142 (1941) to find a "special equity" arising in the favor of Warren. First, the proceeds of the ESC–Reynolds judgment cannot be said to be "funds obtained from the surety." Nor are they the kind of funds—"obtained . . . on the credit of the surety for the purpose of making payment on the debt for which the surety is bound"—as contemplated by the rule. *See* Restatement of Security § 142, *Comment on Clause* (c) at 393 (1941).

Secondly, it cannot be said that the judgment proceeds from the ESC suit were "funds arising out of a contract for which the surety is bound." Those funds arose out of a contract between ESC and Reynolds upon which Warren was not bound. In fact, Warren's contribution to the solvency of ESC occurred subsequent to the cancellation of the ESC–Reynolds contract. The judgment proceeds had no contractual or equitable relationship to the money supplied by Warren to ESC through Walters. Therefore, the bank was justified in following the written directions of Walters as to the application of the proceeds.

## II. The Cross Appeal

The Warrens raise numerous issues in their cross appeal. On the question of community liability, Warren contends the community never received any benefit for the obligation incurred by him as surety, nor did his wife ratify such a pledge of community property to secure the debt, nor is she estopped to deny it. Thus, he argues that the application of the time certificate of deposit belonging to the community to the debt of Walters was a conversion of the certificate and the community is entitled to judgment in the full amount of the certificate. The court found there was a community benefit intended, expected, or received by the Warrens because of the mutual financial interests of them

and the Walters, and because helping ESC was in the best interest of the Warren community.

The suretyship debt or obligation of one of the spouses obligates the community property only if the community is benefited by the obligation.[5] The community is obligated only if the debt or obligation is incurred with the intention or expectation, at the inception of the transaction, on the part of the spouse that a material economic benefit would accrue to the community.[6] The parties disagree as to which has the burden of showing either community benefit or the lack thereof. The Warrens contend the bank must clearly demonstrate that the community has benefited by reason of Warren becoming surety on the obligation, citing *Zarbell v. Mantas*, 32 Wn.2d 920, 204 P.2d 203 (1949); *Case Threshing Mach. Co. v. Wiley*, 89 Wash. 301, 154 P. 437 (1916); and *Spinning v. Allen*, 10 Wash. 570, 39 P. 151 (1895). The bank urges that the burden of proving the community obligation does not exist rests with the Warrens and that there is a presumption that the community is liable, which presumption can only be overcome by clear and convincing evidence. It cites *Malotte v. Gorton*, 75 Wn.2d 306, 450 P.2d 820 (1969); *Dizard & Getty v. Damson*, 63 Wn.2d 526, 387 P.2d 964 (1964); *Beyers v. Moore*, 45 Wn.2d 68, 272 P.2d 626 (1954); and *National Bank of Commerce v. Green*, 1 Wn. App. 713, 463 P.2d 187 (1969).

We agree that the burden of proving lack of community obligation upon the husband's suretyship rests with the party seeking to avoid the obligation. First, the strength of *Spinning v. Allen, supra,* has been sapped consistently through the years by the later cases cited above by the bank. Secondly, at the time he signed the accommodation paper, Warren was considered the statutory manager of the

---

[5]*Potlatch No. 1 Fed. Credit Union v. Kennedy,* 76 Wn.2d 806, 459 P.2d 32 (1969); *Sun Life Assurance Co. v. Outler,* 172 Wash. 540, 20 P.2d 1110 (1933); *Peterson v. Zimmerman,* 142 Wash. 385, 253 P. 642 (1927).

[6]*Meng v. Security State Bank,* 16 Wn.2d 215, 133 P.2d 293 (1943); *Sun Life Assurance Co. v. Outler,* 172 Wash. 540, 20 P.2d 1110 (1933).

community property and his actions were deemed to bind the community assets.[7] Therefore, the question is whether the Warrens overcame by clear and convincing evidence the presumption that the husband's obligation as a surety upon the Walters note was a community obligation. We note the burden is a heavy one, and we agree with the court that the Warrens failed to overcome the presumption.

There was substantial evidence indicating a continuing financial involvement between the Warren and Walters communities from about 1950 when Walters first became associated in the Warren business. As the court noted in its memorandum opinion, "exactly what money might have been owed by Walters to Warren on the date the first note was endorsed would probably be difficult even for the parties to establish between themselves." And there was more evidence of the continuing financial involvement between the two communities, even after the transaction in question. At the time the note was endorsed there was an annuity agreement between the communities. Later, the Warrens became obligated as indemnitors to ESC's surety company in order to keep ESC in business. Warren cosigned a note to the Old National Bank with Walters on another of his son–in–law's business ventures, and Walters assumed certain liabilities of the substantial debts of the Warrens to the ONB. As the court further noted "these long term dealings convince me that Mr. Warren signed the note in question in the hope that by keeping Electric Smith on its feet it would ultimately prove to the benefit of him and his wife." Thus, there was more of a benefit running to the Warren community from Mr. Warren's suretyship obligation here than the purely paternal instincts cited in *Sun*

---

[7] RCW 26.16.030 then provided: "The husband shall have the management and control of community personal property, with a like power of disposition as he has of his separate personal property".

The 1972 amendment now provides: "Either spouse, acting alone, may manage and control community property, with a like power of disposition as the acting spouse has over his or her separate property, . . ."

*Life Assurance Co. v. Outler,* 172 Wash. 540, 20 P.2d 1110 (1933).

 The Warrens next contend that they did not receive consideration for their undertaking on the original promissory note and the renewals which followed. Since Warren neither received the $150,000 nor anything else to evidence his obligation upon the note, he argues that the bank cannot enforce payment on the instrument because of the defense of "want or failure of consideration." RCW 62A.3-306(c). We do not find any merit in Mr. Warren's contention because Washington Comment 1 to RCWA 62A.3-415 provides in part:

> Consideration for the contracts of accommodation parties will be found, as is typically true in suretyship, in consideration which moves from obligee to principal. In accord is Pierce v Lowenthal, 161 Wn 336, 295 P 1021 (1931).

And, Official Comment 3 to the same UCC provision says, "[t]he obligation of the accommodation party is supported by any consideration for which the instrument is taken before it is due." As was stated in *Skagit State Bank v. Moody,* 86 Wash. 286, 290, 150 P. 425 (1915):

> [I]t is only where there is an absence of or failure of consideration to sustain the obligation that the defense is available. If two or more sign a note, the defense of no consideration is not available to the one who signed but who received none of the proceeds. The accommodating party is bound by the consideration moving to the other party and will not be heard to plead, as against the holder of the note, whether in the first hand or in that of an indorsee, no consideration, or even the defense of suretyship.[8]

(Citations omitted.)

 Mr. Warren also argues that the bank converted the cashier's check in his and Walters' names because it paid on the check over the forged endorsement of Warren and not in accordance with Walters' restrictive endorsement "for

---

[8]*Accord, Pierce v. Lowenthal,* 161 Wash. 336, 295 P. 1021 (1931).

deposit only." The court found that the Warrens' claim for conversion of the check was barred by the statute of limitations. Warren argues that the statute does not apply to recoupments or defenses, citing 51 Am. Jur. 2d *Limitation of Actions* §§ 76, 77 (1970) and that he and his community are entitled to recoup conversion of the check against any liability they may have which arose out of the same transaction. We do not agree. While it is true that the statute of limitations is not applicable to defenses such as recoupment, the reason is that "as along as the courts will hear the plaintiff's case, time will not bar the defense which might be urged thereto and which grew out of the transaction connected with the plaintiff's claim . . ."[9] In this case if the statute of limitations bars the Warren action for conversion of the cashier's check, renaming the action one of recoupment or set off will not revive it so as to defeat the statute.

Warren also assigns error to the court's conclusion that he was not discharged on the promissory note by the fact that the bank stamped it "cancelled" and on the reverse side showed the balance to be zero, and then, without the knowledge or consent of Warren, delivered the same to Walters. He argues that as an accommodation party, if he was compelled to pay the instrument, he would have a right of recourse on it.[10] But, he contends that in order to recover on the instrument he must be in possession of it, and by surrendering the instrument to Walters the bank deprived him of the right to recover on the instrument. This, he argues, is a discharge of his liability on the instrument under RCW 62A.3–606(1)(a). The question presented is whether an accommodation party must be in possession of the instrument to which he has lent his name in order to pursue his right of recourse against the accommodated party.

---

[9]51 Am. Jur. 2d *Limitation of Actions* § 76 (1970).

[10]RCW 62A.3–415(5).

■ For two reasons, we do not believe that Warren's possession of the instrument was necessary in order for him to pursue his rights. First, the statutory discharge of parties by the reacquisition of the instrument by a party liable requires that the party, "reacquires the instrument *in his own right*." RCW 62A.3–601(3)(a). It is obvious that Walters did not so reacquire the instrument. The note was paid with Warren's certificate of deposit prior to being marked cancelled and surrendered to Walters. When the certificate was applied to Warren's obligation on the note, he was discharged in any event. Secondly, Warren's rights as a surety to subrogation have not been eliminated by the UCC. *See Ilg v. Andrews,* 10 Wn. App. 936, 520 P.2d 1385 (1974), where the court discussed the difference between the pre–code methods by which a surety could proceed against his principal and the action contemplated by the code on the instrument itself. The UCC also contemplates both the common–law and code methods of obtaining subrogation for the surety.

J. White & R. Sommers, *Handbook of the Law Under the Uniform Commercial Code* § 13–16 (1972), at page 439 agree, saying:

> Presumably the surety has the creditor's rights not only on the instrument but also on the underlying obligation. One can arrive at that conclusion either by an expansive reading of the words "recourse on the instrument" or by the application of general suretyship rules to the case under section 1–103.

RCW 62A.1–103 provides:

> Unless displaced by the particular provisions of this Title, the principles of law and equity, including the law merchant and the law relative to capacity to contract, principal and agent, estoppel, fraud, misrepresentation, duress, coercion, mistake, bankruptcy, or other validating or invalidating cause shall supplement its provisions.

*See also* Washington Comment 3 to RCWA 62A.3–601.

Thus, since Warren has rights against Walters on the

underlying obligation, as well as upon the instrument, possession of the instrument is not a condition precedent to his action against Walters.

Mr. Warren's next contention is that the judgment of the court should have been augmented by $35,642 representing a security interest the bank obtained in Walters' lake property and which was released by the bank without the knowledge, consent or permission of Warren. Under RCW 62A.3–606(1)(2), Warren argues that he was released on his obligation to the bank to the extent that the collateral interest in Walters' property was released by the bank. The facts concerning this transaction involve an attempt by the Walters' community to preserve their interest in property at Priest Lake, Idaho. They were in danger of losing the property because of their failing financial ability to make the mortgage payments so they requested the bank advance them $5,700 to make the delinquent payments. The bank agreed if the Walters would grant to them a security interest in the property subject to the mortgage. Although the security documents were completed and filed, the bank did not advance the funds as it had agreed because prior to that time Walters, in writing, released the bank from its commitment to make the payments and requested that the bank release the security interest in the property.

There was no evidence that the security interest was obtained for any purpose other than the intended loan which was never made. Under those circumstances the bank received no consideration for retaining this additional collateral. In addition, there was no evidence of reliance by Warren on the security agreement. Had it been obtained by the bank for the purpose of further securing the obligation of Walters on the note upon which Warren was a surety, we would have no difficulty in finding that Warren was released to that extent.

The Warrens' final contention is that the bank breached its duty of good faith owed to them and as a result they were discharged as surety in the total amount of $150,000.

The duty, they argue, requires a creditor to disclose to the surety any facts within the knowledge of the creditor materially increasing the surety's risk, whether such facts are requested by the surety or not. Citing *Carpenter Lumber Co. v. Hugill,* 149 Wash. 45, 270 P. 94 (1928), and *Associated Indem. Corp. v. Del Guzzo,* 193 Wash. 486, 81 P.2d 516 (1938), the Warrens contend that if the obligation of good faith is not fulfilled the surety is discharged in total. Primary reliance is placed upon Restatement of Security § 124(2) (1941):

> Where, during the existence of the suretyship relation, the creditor discovers facts unknown to the surety which would give the surety the privilege of terminating his obligation to the creditor as to liability for subsequent defaults, and the creditor has reason to believe these facts are unknown to the surety and has a reasonable opportunity to communicate them to the surety without a violation of a confidential duty, the creditor has a duty to notify the surety, and breach of this duty is a defense to the surety except in respect of his liability for defaults which have occurred before such disclosure should have been made.

■ In light of both the general and specific comments on the application of Restatement of Security § 124, and in light of the continuing financial involvement between the Warrens and Walters, we do not find a breach of duty on the part of the bank to Warren as surety sufficient to relieve him of his obligation on the promissory note. Specifically, the facts which the creditor must disclose must be those kinds of facts which give the surety the privilege of terminating his obligation to the creditor as to liability for subsequent defaults. The Warrens have not shown how Warren, had he been notified of the facts that he alleges were withheld by the bank, would have been allowed to terminate his obligation. Furthermore, we find it difficult to believe, in view of evidence of close family ties and extensive financial interrelationships, the facts alleged to have been withheld were not in fact known by Warren prior to

the time they came to the knowledge of the bank. Therefore, we do not find a breach of duty on the part of the bank in failing to advise Warren of Walters' failing financial condition.

Nor do we believe there was a breach of the duty of good faith on the part of the bank in charging 7 percent interest on the promissory note upon which Warren was a surety and paying only 5 percent interest on the certificate of deposit. First, the differential, according to testimony of an officer of the bank, was required by regulation of the Federal Reserve Board, and, secondly, Warren was well aware of the difference between the interest rates. There is evidence that the bank offered to pay him a greater interest on the certificate of deposit, but he refused because he knew that the interest rate on the promissory note had also risen.

In light of our disposition of the issues regarding the alleged misapplication of the judgment proceeds and the alleged release of collateral, we find no breach of the duty of good faith on the part of the bank as to those matters or as to the delivery of the final promissory note to Walters rather than to Warren.

Finally, we do not see how the acceptance by the bank of the assignment by Walters of the note from ESC to him and the judgment proceeds to secure the note violates any duty on the part of the bank. If there was a breach of duty here, it was Walters who breached that duty when he (1) failed to fulfill his promise to his father–in–law that he would repay the loan at the successful conclusion of the lawsuit; (2) failed to have his father–in–law named an additional payee on the note from ESC to him; and (3) failed to notify his father–in–law that he was directing the bank to disburse the proceeds of the judgment to obligations other than that to which his father–in–law had lent his good name.

We have carefully examined all remaining assignments of error and find them without merit.

368

Therefore, the judgment of the Superior Court is reversed in part and affirmed in part in accordance with this opinion. The bank shall recover costs.

MUNSON, C.J., and GREEN, J., concur.

Petition for rehearing denied May 12, 1978.

Review granted by Supreme Court October 20, 1978.