CHARLES M. WILLIAMS and THE ESTATE OF PATRICIA WILLIAMS, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Estate of Williams v. Commissioner
Docket No. 3538-77.
United States Tax Court
T.C. Memo 1981-54; 1981 Tax Ct. Memo LEXIS 688; 41 T.C.M. (CCH) 844; T.C.M. (RIA) 81054; February 11, 1981. Thomas B. Tilford,Clay R. Randall, PatriciaL. Murphy, for the petitioners. Kenneth W. McWade, for the respondent. HALL MEMORANDUM FINDINGS OF FACT AND OPINION HALL, Judge: Respondent determined deficiencies in petitioners' income tax of $ 33,619.20 for 1973 and $ 5,905.36 for 1974. Due to concessions by petitioners, the sole *689 issue remaining for decision is whether petitioners' deductible share of the 1973 net operating loss incurred by an electing small business corporation exceeds the amount allowed by respondent. FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. At the time they filed their petition, Charles M. Williams ("Williams") and Patricia Williams resided in Otis Orchards, Washington. Patricia Williams died shortly after the filing of the petition and her estate was substituted as co-petitioner in this proceeding. Although Patricia Williams is no longer a petitioner, Charles and Patricia Williams will hereinafter be referred to as petitioners. On April 1, 1971, petitioners formed Holiday Hills Recreation Center, Inc. ("Holiday Hills") for the development of a multipurpose recreational facility. Petitioners' plan called for the construction of (1) an arena suitable for convention exhibits or hockey games, (2) a one-half mile multi-purpose lighted sports track for spectator racing events, (3) a ski hill capable of accomodating three ski runs, (4) a dormitory and lodge building, (5) a recreational vehicle park, and (6) a sports rental shop. Petitioners *690 expected the entire project to be completed by the end of 1972, and certain of the facilities were expected to be completed earlier. From its incorporation through the years in issue, Holiday Hills qualified as an electing small business corporation as defined in section 1371. [1] Holiday Hills filed its Federal income tax returns using a taxable year ending March 31. On April 1, 1971, petitioners transferred to Holiday Hills certain real estate and other assets with an adjusted basis of $ 854,269, subject to liabilities of $ 610,463. In exchange for this net contribution of $ 243,806, Holiday Hills issued to petitioners 50,000 shares of common stock valued at $ 2 per share and $ 143,806 of debenture notes. [2]
On August 5, 1971, Williams applied for a $ 1,600,000 line of credit from Seattle-First National Bank (the "Bank"). In his application, Williams indicated that the line of credit was intended to provide interim financing for the Holiday Hills project. *691 Furthermore, he represented that: All proceeds of this loan will be applied to existing construction and the completion of projects outlined in Exhibit (A) of the Holiday Hills Sports and Recreation complex located at Liberty Lake, Washington, in the Spokane Valley. Williams offered as security all his Holiday Hills stock and some of his shares in American Sign & Indicator Corporation ("AS&I"), a corporation in which he owned a substantial interest. At the time of the application, Williams' personal liabilities included a $ 40,000 loan and a $ 300,000 loan from two branches of the Bank. Williams had used $ 96,791.17 of the $ 300,000 loan proceeds for the Holiday Hills project. In his loan application Williams indicated that $ 340,000 of the $ 1.6 million requested would be used to repay these loans. On August 24, 1971, the senior loan committee of the Bank approved a $ 1,900,000, 8-1/2 percent secured credit line bearing a maturity date of September 1, 1973. The Bank conditioned its approval on the following terms: (1) pledging 213,140 shares of AS&I stock; (2) obtaining a letter agreement from AS&I to the effect that, if necessary, it would repurchase the pledged stock *692 at the maturity of the loan for the then outstanding principal and interest balance; (3) assigning a minimum of $ 250,000 face value of life insurance on Williams' life; (4) assigning a real estate mortgage executed by Holiday Hills to petitioners covering the property under development; (5) obtaining an agreement restricting petitioners' borrowings during the term of the loan; and (6) utilizing a portion of the proceeds to cancel Williams' then existing loans from the Bank. On October 6, 1971, petitioners borrowed $ 200,000 from the Bank to provide additional working capital for Holiday Hills. [3] The Bank deposited the $ 200,000 loan proceeds directly into Holiday Hills' account. Holiday Hills erroneously reflected the transaction as a loan from the Bank to the corporation rather than as a loan from petitioners to the corporation. On October 13, 1971, petitioners, Holiday Hills and the Bank executed a loan agreement which, with minor adjustments, reflected the terms approved previously by the Bank. The loan agreement, in pertinent part, stated: The undersigned, Charles M. Williams *693 and Patricia Williams, his wife ("Williams") and Holiday Hills Recreation Center, Inc. ("Holiday") propose to borrow from your bank $ 2,200,000.00, such funds to be used as interim financing for development of Borrower's project in the Spokane Valley. This letter sets forth the terms and conditions pertaining to such loan. Williams and Holiday are collectively referred to herein as "borrowers". The loan indebtedness is to be repayable on demand but in no event later than October 1, 1973 as more fully set forth in form of note attached, Exhibit "A". * * * As security for the repayment of such loan and/or any other indebtedness of Williams and/or Holiday to the bank, (a) Williams will pledge 312,210 shares of American Sign & Indicator Corp. stock owned by Williams, together with 50,000 shares of Holiday Hills Recreation Center, Inc. stock owned by Williams; (b) Williams will execute and deliver a "life insurance assignment" * * *; and (c) Holiday will execute and deliver to bank a real estate mortgage(s) or trust deeds(s) in form and substance satisfactory to bank covering all the real estate owned by or being purchased by Holiday. Any encumbrances or unpaid balances due on such *694 real estate are to be satisfied from the loan proceeds and mortgage title insurance shall be provided by Holiday showing title satisfactory to bank. Borrowers have furnished bank with outline specifications generally depicting the nature, plans, scope and construction schedule of the Holiday Hills Recreation Center project. Borrowers have thoroughly familiarized themselves as to all foreseeable and anticipated costs of the project and believe that the $ 2,200,000.00 interim loan is sufficient to fully pay for and make such project fully operational. The $ 2,200,000.00 loan is for interim financing purposes only, and Borrowers agree to diligently search for and apply for permanent financing so as to obtain the same from sources other than bank prior to October 1, 1973. * * * While any of the subject indebtedness remains unpaid to bank, neither Holiday nor Williams will additionally borrow or otherwise become additionally indebted, directly or indirectly, as principal, guarantor, or otherwise, for any amount in excess of $ 10,000.00 at any given time, unless previously authorized by bank so to do. All loan proceeds shall be used for the purposes of the project described herein *695 and for no other purpose. During the term of the loan, Holiday will promptly furnish to bank (a) a copy of its annual statement including balance sheet and statements of profit and loss and surplus for the year covered by such annual statement; (b) a statement covering operations for the preceding month, showing income and expense for such month. Williams shall furnish supplemental personal financial statements or information as and when reasonably required by bank. Holiday and Williams shall each notify bank of any materially adverse change of circumstances or of any litigation or threatened claims against or affecting either promptly upon becoming aware of the same. While any portion of the loan remains outstanding, Williams shall defer taking any salary or bonus as officers, directors, employees or otherwise, from Holiday Hills Recreation Center, Inc. Also during such period Williams shall not accept any funds by way of repayment of any loan made by Williams to Holiday and Holiday shall not pay or declare any dividend to shareholders. On October 27, 1971, the parties executed the promissory note referred to in the loan agreement as Exhibit "A". The promissory note provided, *696 in pertinent part, that: On demand but in no event later than October 1, 1973, CHARLES M. WILLIAMS and PATRICIA WILLIAMS, husband and wife, and HOLIDAY HILLS RECREATION CENTER, INC., jointly and severally promise to pay to the order of SEATTLE-FIRST NATIONAL BANK, SPOKANE & EASTERN BRANCH (the "Bank"), at its office at Spokane, Washington, the principal sum of TWO MILLION TWO HUNDRED THOUSAND DOLLARS ($ 2,200,000.00) in lawful money of the United States, and to pay interest on said principal sum or the unpaid balance thereof in like money at said office from the date hereof to the maturity hereof on the First day of January, April, July and October in each year and at maturity at Eight and One-Half Percent (8-1/2%) per annum. The Bank and petitioners anticipated that the $ 2,200,000 debt would be serviced and repaid from the future operations of Holiday Hills and the permanent financing to be obtained upon the project's completion. As security for these payments the Bank relied primarily on the 312,210 shares of AS&I stock pledged by petitioners. The Bank applied $ 546,782.64 of the loan proceeds against Williams' prior loans from the Bank. [4] The Bank credited the remaining *697 $ 1,653,217.36 to Holiday Hills' checking account. Holiday Hills used a portion of this amount to pay a $ 727,200 obligation owing from Williams to AS&I and to pay a $ 113,132.55 obligation owing from Williams to Sherwood and Roberts, Inc., an unrelated corporation. The $ 546,782.64 applied directly to Williams' prior Bank obligations and the $ 840,332.55 paid directly to Williams' other creditors were treated on Holiday Hills' books and records as reductions in the amounts owed by the corporation to petitioners. [5]
The March 31, 1972, balance sheet of Holiday Hills reported the $ 2,200,000 loan as a current liability. In conjunction with the audit of the 1972 balance sheet, Holiday Hills' independent accountants received confirmation from the Bank that, as of March 31, 1972, Holiday Hills was directly liable to the Bank for $ 2,200,000 and that the source of the liability was an October 27, 1971 loan guaranteed by Charles and Patricia Williams. Consistent *698 with its reply to the confirmation, the Bank's internal documentation of the loan, i.e., the Memorandum for Credit File, refers repeatedly to the Holiday Hills' loan as being personally guaranteed by petitioners. On October 29, 1973, the parties executed an addendum to the October 13, 1971 agreement which extended the due date on the $ 2,200,000 loan to November 30, 1974. The October 29 addendum makes repeated reference to petitioners' position as guarantors. [6] The Bank agreed to the extension based on its continued hope that the Holiday Hills' project would succeed. [7]
*699 The net operating loss sustained by Holiday Hills during its 1972 taxable year was sufficient to completely absorb petitioners' $ 243,806 initial basis in the stock and the notes of Holiday Hills pursuant to section 1376(b). Holiday Hills reported a $ 631,583 net operating loss for the taxable year ending March 31, 1973. Petitioners deducted this entire amount on their 1973 joint Federal tax return pursuant to section 1374. Respondent disallowed $ 396,538 of this deduction based on his determination that $ 546,782 of Holiday Hills' indebtedness to petitioners had been satisfied from the $ 2,200,000 borrowed from the Bank on October 27, 1971. OPINION The sole issue is whether petitioners' deductible share of the net operating loss incurred by Holiday Hills Recreation Center, Inc. ("Holiday Hills"), an electing small business corporation, exceeds the amount allowed by respondent. Section 1374 permits a net operating loss of an electing small business corporation to be taken as a deduction from the gross income of the shareholders. A shareholder is permitted to deduct from his gross *700 income only his pro rata share of such loss. Section 1374(c)(2) establishes a limitation on such loss. [8] The deduction may not exceed the total of a shareholder's adjusted basis in the stock of the corporation and the adjusted basis of any indebtedness of the corporation to the shareholder. In October 1971, Holiday Hills and petitioners, as co-makers, borrowed $ 2,200,000 from Seattle-First National Bank (the "Bank"). As a prerequisite to the loan, the Bank required that $ 546,782.64 of the proceeds be used to repay loans made previously by the Bank to Williams. At the same time Holiday Hills owed petitioners at least $ 546,782.64. The specific question presented is what effect, if any, did the October 1971 loan transaction have *701 upon the then-existing indebtedness between petitioners and Holiday Hills. Petitioners assert that the October 1971 $ 2,200,000 loan did not reduce Holiday Hills' indebtedness to petitioners and therefore, the adjusted basis of Holiday Hills' indebtedness to petitioners ($ 781,827) [9] was sufficient to permit petitioners to deduct the entire $ 631,583 net operating loss incurred in 1973. Respondent contends that the October 1971 $ 2,200,000 loan and the associated payment of Williams' $ 546,782.64 outstanding Bank loans reduced the amount then owed by Holiday Hills to petitioners, and, because of this reduction, respondent determined that petitioners' deductible share of Holiday Hills' 1973 net operating loss ($ 631,583) was limited pursuant to section 1374(c)(2) to $ 235,045. For the reasons stated below, we agree with respondent. The preponderance of the evidence presented supports the view that Holiday Hills received, actually or constructively, the entire loan proceeds and immediately used $ 546,782.64 of those proceeds to reduce its indebtedness *702 to petitioners by repaying Williams' Bank loans. There are several factors that support this "constructive receipt" view. First, in his application for the loan, Williams clearly indicated that allproceeds would be applied to the Holiday Hills project. [10] Second, we do not believe it is merely coincidental that Holiday Hills' records reflected the entire $ 2,200,000 loan as its liability and that those records reflected the $ 546,782.64 loan repayment as a reduction in the corporation's indebtedness to petitioners. Although accounting entries are merely evidentiary and not conclusive, see, e.g., Estate of Falese v. Commissioner, 58 T.C. 895, 898 (1972), these contemporaneous entries shed some light on how the parties viewed the transaction in 1971. [11] Third, our "constructive receipt" analysis is consistent with how a significant portion of the remaining loan proceeds was used. Williams' Bank loans were not the only ones paid by Holiday Hills from the loan proceeds. Holiday Hills used $ 840,332.55 of the loan proceeds to repay Williams' other creditors. *703 This amount was paid directly by Holiday Hills to those creditors rather than to Williams and such amount was treated as a reduction in the amount owed by the corporation to petitioners. Fourth, the parties anticipated that the entire $ 2,200,000 loan would be serviced and repaid by Holiday Hills, thus indicating that Holiday Hills was deemed by the parties to be the recipient of the entire proceeds. *704 Petitioners contend that Holiday Hills never had dominion and control over the $ 546,782.64 of loan proceeds in dispute. According to petitioners, the Bank's direct application of the $ 546,782.64 to repay Williams' then outstanding loans precludes our finding that these funds were constructively received by Holiday Hills. We do not agree. Merely because all the funds were not deposited in Holiday Hills' bank account does not mean it had no dominion and control over the funds. After all, the approval of the loan by the Bank was conditioned on the use of a portion of the proceeds to pay Williams' Bank loans. By signing the loan Holiday Hills implicitly gave its approval to that disbursement. Moreover, it makes perfect sense for the Bank to take the obvious short-cut of crediting the funds directly to Williams' loans rather than disbursing the funds first to Holiday Hills. The tax consequences dictated by our view of the loan transaction are straight-forward. Holiday Hills' indebtedness to petitioners does not include the $ 546,782.64 nor does any additional indebtedness arise from petitioners' status as co-makers on the $ 2,200,000 loan. See, e.g.,Underwood v. Commissioner, 535 F. 2d 309, 312 (5th Cir. 1976), *705 affg. 63 T.C. 468 (1975); Borg v. Commissioner, 50 T.C. 257, 264-265 (1968); Raynor v. Commissioner, 50 T.C. 762, 770-771 (1968). [12] As stated in Raynor, supra: No form of indirect borrowing, be it guaranty, surety, accommodation, comaking or otherwise, gives rise to indebtedness from the corporation to the shareholders until and unless the shareholders pay part or all of the obligation. 50 T.C. at 770-771. Accordingly, petitioners' deductible share of Holiday Hills' 1973 net operating loss is limited by section 1374(c)(2) to $ 235,045, the amount allowed previously by respondent. Petitioners' view of the loan transaction differs significantly from the above. Petitioners contend that the outstanding balance of their loans to Holiday Hills should not be reduced by the $ 546,782.64 because the corporation never had dominion and control over the disputed amount. To the extent that $ 546,782.64 of the loan *706 proceeds were directly applied against Williams' debts owing to the Bank, petitioners argue that they were in effect the primary obligors and Holiday Hills was an accommodation party. [13] As to the remainder of the proceeds, petitioners argue that the roles were reversed, i.e., Holiday Hills was the primary obligor and petitioners were accommodation parties. Based on this analysis, petitioners conclude that Holiday Hills' indebtedness to petitioners included the disputed $ 546,782.64 because (1) the loan proceeds applied to Williams' bank loans were not first attributable to Holiday Hills, and (2) Holiday Hills' accommodation status with respect to the $ 546,782.64 did not create an offsetting indebtedness running from petitioners to Holiday Hills. [14]
*707 There are several flaws in petitioners' analysis. First, as previously discussed, the facts indicate that the entire loan proceeds were constructively received by Holiday Hills. Second, petitioners' "bifurcation theory" neither makes sense nor is supported by the record. The record indicates that a single $ 2,200,000 loan existed. (Petitioners concede this fact.) We are not convinced that the parties intended to occupy dual roles vis a vis the loan. [15] Such intent is not directly expressed nor inferable from the facts presented. Accordingly, we cannot subscribe to the reciprocal accommodation status requested by petitioners. See 2 Anderson, Uniform Commercial Code § 3-415:9 (2d ed. 1971) ("The intention of the parties is the significant element in determining whether a given party is an accommodation party and the identity of the party accommodated.") Furthermore, the fact that Holiday Hills received, at a minimum, the direct benefit of $ 1,653,217.36 of the loan proceeds precludes its accommodation status. See Downie v. Cooledge,48 Wash. 2d 485, 294 P. 2d 926, 930 (1956); 2 Anderson, Uniform Commercial Code § 3-415:9 (2d ed. 1971); J. White & R. Summers, *708 Uniform Commercial Code § 13-13 at 431 (1972). In sum, we reject petitioners' analysis of the loan transaction. [16]
To reflect the foregoing, Decision will be entered for the respondent.
Footnotes
1. All statutory references are to the Internal Revenue Code of 1954, as in effect during the years in issue.↩
2. At all times relevant to this opinion, petitioners owned 100% of Holiday Hills' outstanding stock.↩
3. This loan increased petitioners' indebtedness to the Bank to a total of $ 540,000.↩
4. Of this amount, $ 6,782.64 represented interest owed by Williams on his loans. ↩
5. On March 31, 1975, a reversing entry was made on Holiday Hills' books which increased the amount owed to petitioners by $ 546,782.↩
6. For example, the addendum provides: Williams acknowledges that the subject loan (Two Million Two Hundred Thousand Dollars ($ 2,200,000), together with any additional advances, have been and will be made with primary reliance upon their guaranty and the collateral given by them, and that Bank is not obliged to exhaust its recourse against Holiday or Holiday's collateral before being entitled to payment from the Williams of all amounts guaranteed. Williams acknowledges further that all collateral assigned by them, including the assignment of contracts * * * are intended as security for their direct obligations to the Bank, together with their guaranty * * * of Holiday's obligations. Bank may make such demands and take such action as it in its sole discretion deems advisable. ↩
7. This optimism was reflected in the Bank's internal files dated August 20, 1973: After working with this venture for over two years, we are nearing the completion of the construction. We are also nearing the opening of Expo when [Holiday Hills] has its best chance to generate a favorable cash flow. Both these factors provide an opportunity for [Williams] to either sell the complex or obtain long-term financing.↩
8. Section 1374. CORPORATION NET OPERATING LOSS ALLOWED TO SHAREHOLDERS. (c)(2) Limitation.--A shareholder's portion of the net operating loss of an electing small business corporation for any taxable year shall not exceed the sum of-- (A) the adjusted basis * * * of the shareholder's stock in the electing small business corporation * * *, and (B) the adjusted basis * * * of any indebtedness of the corporation to the shareholder * * *.↩
9. The $ 781,827 figure consists of the undisputed indebtedness of $ 235,045 plus the disputed indebtedness of $ 546,782.↩
10. Petitioners would have us believe that the application should be read as follows: All proceeds except those used to repay Williams' obligations to the Bank will be used on the Holiday Hills project. We decline to do so. The application noted that $ 340,000 of the proceeds would be disbursed to repay the two Bank loans then outstanding. Accordingly, Williams' reference to all proceeds included↩ those amounts to be credited against the outstanding loans. This indicates to us that payment of those loans was considered to be a cost of the project. 11. Petitioners argue that these entries were erroneous and were corrected by the $ 546,782.64 reversing entry made on the corporation's books on March 31, 1975. That entry restored the $ 546,782.64 as a liability to petitioners. At trial petitioners attempted to justify the reversing entry based on the testimony of its independent accountant. The testimony relating to this entry, however, was premised on the Court's acceptance of petitioners' factual and legal arguments. This opinion rejects those arguments and, accordingly, we do not give credence to the post hoc reversing entry.↩
12. See also Duke v. Commissioner, 35 T.C.M. 229↩, 45 P-H Memo. T.C. par. 76,050 (1976).
13. As defined by statute: An accommodation party is one who signs the instrument in any capacity for the purpose of lending his name to another party to it. Wash.Rev. Code Ann. sec. 62A.3-415(1). An accommodation party is always a surety which includes a guarantor. Id. (official comment); Warren v. Washington Trust Bank,19 Wash. App. 348, 575 P. 2d 1077 (1978), affd. 92 Wash. 2d 381, 598 P. 2d 701 (1979). Somewhat more enlightening, however, is the following extract taken from a leading treatise: Structurally, suretyship is a three party relationship involving the creditor, the principal debtor and the surety. The debtor's obligation as a purchaser of goods or borrower of money is already familiar. So, too, his obligation as a signer of a negotiable instrument. The surety's obligation is somewhat different. In effect the surety undertakes to "back up" the performance of the debtor and he thereby gives the creditor the added assurance of having another party to the obligation. It is common practice for a surety to appear on a note either as a co-maker or as an indorser. Assume for example that a father is going to be the surety on his son's contract to pay for a new car. The father may sign the note as co-maker or he may simply indorse the note. As we will see, in either case he is what the Code calls an "accomodation party" and owes the holder of the note the obligation of a maker, or of an indorser as the case may be * * *. As between the surety and the debtor, it is clear that the debtor has the primary obligation to pay the debt. Since the creditor is entitled to only one performance and the debtor receives the benefit of the transaction, the surety's obligation is undertaken with the expectation that the debtor will meet his commitment to the creditor. Thus if the surety is made to pay his principal's debt, he has the right to recover from the principal. * * * [Footnotes omitted.] J. White & R. Summers, Uniform Commercial Code 426 (1972). ↩
14. Petitioners cite Wash. Rev. Code Ann. sec. 62A.3-415(5) and Ilg v. Andrews,10 Wash. App. 936, 520 P. 2d 1385↩ (1974) in support of this latter proposition.
15. We have been unable to find a case in which dual roles existed within the context of a single loan. Petitioners cite us to Philadelphia Bond & Mortgage Co. v. Highland Crest Homes, Inc.,235 Pa. Super. 252, 340 A. 2d 476 (1975), but that case merely states that because one signs a note as a co-maker does not preclude him from being an accommodation party. The co-maker in Philadelphia Bond, however, was found to be an accommodation party on the entire↩ note. 16. As a result of this rejection, we do not address respondent's argument that under the laws of the State of Washington a corporation cannot be an accommodation party.↩