No. 84-99

IN THE SUPREME COURT OF THE STATE OF MONTANA

1985

---

MORRELL TRIBBY,

            Plaintiff and Respondent,

    -vs-

NORTHWESTERN BANK OF GREAT
FALLS,

            Defendant and Appellant.

---

APPEAL FROM:   District Court of the Eighth Judicial District,
               In and for the County of Cascade,
               The Honorable John M. McCarvel, Judge presiding.

COUNSEL OF RECORD:

        For Appellant:

            Church, Harris, Johnson & Williams; Charles C. Lovell
            argued, Great Falls, Montana

        For Respondent:

            Anderson & Strause; Howard Strause argued, Great Falls,
            Montana
            Sandra K. Watts, co-counsel, Great Falls, Montana

---

                            Submitted:   February 21, 1985

                            Decided:   August 5, 1985

Filed: AUG    1985

*Ethel M. Harrison*

---
                            Clerk

Mr. Justice L. C. Gulbrandson delivered the Opinion of the Court.

Morrell Tribby filed suit against Northwestern National Bank of Great Falls (hereinafter Norwest) on December 23, 1980, alleging that it wrongfully honored checks on a partnership account without Tribby's required approval and that Norwest retaliated for the initial suit by refusing to make automatic loan advances on a personal account. The jury verdict, following a trial in the fall of 1983, awarded Tribby $119,890 compensatory and $1,000,000 punitive damages on the first claim and found for Norwest on the second claim. Norwest appeals the trial court's ruling on its objections to the jury panel and jury selection process and the judgment and verdict on the first claim. We affirm in part, reverse in part and remand for a new trial.

On December 8, 1972, Tribby and his nephew Edward Anderson opened a checking account to deposit monies from their partnership and other joint business, in the name of "Tribby-Anderson Land Account" with Norwest. The signature card required both Tribby's and Anderson's signatures on a check before it would be honored by Norwest. The bank statements were to be sent to an address in Great Falls. Until 1979, Norwest occasionally honored checks that did not contain Tribby's signature. Tribby complained and as a result the signature card was annotated with "Two Signatures Required" in red.

Tribby was the only limited partner in a partnership with Anderson, the general partner. The business engaged in speculation, subdivision and sale of land in Montana. Tribby and Anderson executed a formal partnership agreement effective January 1, 1973. This agreement gave Anderson managerial control, provided that either party could sign

2

checks on the partnership account and divided profits equally.

Norwest issued a new signature card at Anderson's request in January 1979. The new card authorized the bank to honor checks signed by either Anderson or his new wife, Candy, and to send the statements to an address in Spokane, Washington. Tribby's signature was not required according to the new card. Norwest did not notify Tribby or obtain his authorization to change the signature requirement or the address. Although the partnership agreement permitted one-party signatures on checks, the bank employees who issued the new card were not aware of the agreement or its contents.

In July 1979, when Tribby went to Norwest on another matter, a vice-president informed him his signature was not required to authorize withdrawals on the account but did not tell him about the new card. Tribby disagreed and told the vice-president that no check should be honored without his signature. Later in the fall of 1979, Tribby spoke with another vice-president about checks being honored without his signature and was informed that Norwest would not change its policy of honoring checks signed only by Anderson. In November 1979, Tribby's attorney wrote to Norwest and instructed them not to honor checks unless signed by Tribby. Norwest responded by stating the signature card required only one signature and that it would not be changed unless a change was requested in writing by both parties. Tribby and his wife went to the bank in January 1980 and requested a copy of the signature card. They were told the card was lost. When they returned later that same day a different vice-president produced both signature cards. This was Tribby's first notice that a new card had been issued. At this time Norwest stopped honoring checks containing only one signature.

Tribby sued Anderson in March 1980 alleging wrongful withdrawal of monies from partnership accounts, conversion of partnership property and fraud in withdrawing the funds and inducing Norwest to issue a new signature card. Tribby sued Norwest in December 1980 alleging Norwest failed to exercise ordinary care in issuing a new signature card, wrongfully honored checks without Tribby's signature and wrongfully failed to cease honoring checks after being notified to do so.

Following Tribby's suit, Norwest affected Tribby's credit status by placing an outstanding loan to him on a "watch list." The bank refused to renew a loan that had been renewed annually for several years. It also cancelled his ready reserve account which had permitted Tribby and his wife to write checks exceeding the balance in their account. The checks would then be covered by the bank as a loan. In a letter informing Tribby that the account was cancelled, Norwest stated the account was overextended although, at the time, the balance on the account had been paid off. In addition, Norwest refused to pay several items presented before Tribby was notified that the account had been restricted or cancelled.

Norwest answered the complaint and filed a third party complaint against Anderson and his wife on June 16, 1981. This complaint alleged that Anderson had directed Norwest to accept a new signature card in accordance with his authority contained in the partnership agreement and that the Andersons were primarily liable for any loss sustained by Tribby. Norwest also made a motion to dismiss Tribby's complaint and to consolidate Tribby's suit against Anderson with the suit against Norwest. Tribby filed a motion to dismiss the third party claim. Following the submission of briefs and a hearing, the District Court granted Tribby's motion to

4

dismiss the third party claim and denied Norwest's motions to dismiss and consolidate the claims on October 7, 1982.

The case first came to trial on September 26, 1983. The District Court agreed to Tribby's request to disqualify for cause any prospective juror who had an account with Norwest pursuant to section 25-7-224(3), MCA (1981). When the judge asked how many of the potential jurors were customers of the bank, most panel members raised their hands. He then concluded that a new panel would be required in order to get a jury and commented that "as the clerks calls the jurors, I will have to ask them that question, because it looks like three-quarters of the jurors in this case are customers of that bank." Later that day the attorneys for Norwest discovered that effective October 1, 1983, the statute had been amended so that the debtor-creditor relationship could no longer be invoked as a challenge for cause solely because a prospective juror is a depositor of funds with a bank. The court and opposing counsel were both notified but the court and the parties had no further discussions on questioning the jurors.

After the trial had been reset for November 14, 1983, Tribby's attorney advised a deputy clerk that she was to ask prospective jurors whether they had any business with Norwest other than a savings or checking account. The clerk checked with the judge, who told her to follow the procedure set out in the statute concerning excusing jurors for cause. When the deputy clerks telephoned prospective jurors they identified Norwest as a party; asked each prospective juror whether they had transactions or business other than savings or checking accounts with Norwest; excused those who said they had transactions or business with Norwest other than deposits; excused prospective jurors who claimed to be ill, infirm or going on vacation; and excused one person who did

5

not have an account at Norwest but said she was a friend of the bank president's wife. This was done without notice to or participation by counsel for Norwest. The judge denied Norwest's objections to the jury panel and jury selection process and the case proceeded to trial on November 14, 1983.

The seven issues presented by Norwest on appeal are:

(1) Was the jury panel selected contrary to law and in violation of Norwest's right to trial by a representative, fair and impartial jury?

(2) Did the District Court err in denying Norwest the opportunity to present evidence on the cause and extent of Tribby's claimed damages?

(3) Did the District Court err in failing to give effect to the Tribby-Anderson partnership relationship which would require dismissal of this action?

(4) Did the trial court err in permitting the jury to consider recovery under "bad faith" tort principles?

(5) Did the District Court improperly allow Tribby to amend his theory of the case and damages on the eve of trial to the prejudice of Norwest?

(6) Were the damages erroneous, excessive and the result of passion and prejudice?

(7) Was the preparation of a "Certified Supplemental Record" by the District Court an abuse of discretion?

The jury panel selection is subject to two separate inquiries. The first, a procedural inquiry, is whether there was a material deviation or departure from the statutes on jury selection. The second, a substantive inquiry, is whether the parties had a trial before a fair and impartial jury. Reversible error can occur on either question.

Norwest contends that the jury panel selection process used in this case materially deviated from three statutes or rules. Rule 47(a) M.R.Civ.P. requires the court to try

6

challenges for cause and to permit examination of prospective jurors. Subdivision (b) of that rule requires an initial panel be drawn before any voir dire examination of the jury. Here, the clerks examined the prospective jurors using questions given to them by Tribby's counsel without any notice to counsel for Norwest. The clerks released prospective jurors from jury duty based on answers to the questions, thus excusing them for cause without notice to opposing counsel or a ruling by the court. Finally, this questioning took place before an initial panel was called. These actions materially deviate from Rule 47 M.R.Civ.P. on the examination of jurors in that the clerks rather than the court took these actions and they occurred prior to the calling of an initial panel.

Section 3-15-313, MCA, allows the court, or jury commissioner (here the clerk) with the approval of the court, to excuse prospective jurors if jury service would entail undue hardship. The record does not indicate, with one possible exception, which, if any prospective jurors were excused for undue hardship. The record does indicate the clerk excused jurors because of their relationship with Norwest without the approval of the court. This action is outside that permitted by section 3-15-313, MCA.

Section 25-7-223, MCA states that challenges for cause may be taken for a debtor-creditor relation but not when that relation arises solely because a prospective juror is a depositor of funds with a bank or similar financial institution. The statute is discretionary on its face; it is exercisable only by the judge not the clerk. The parties may raise a challenge for cause, section 25-7-221, MCA, or may waive it, 47 Am.Jur.2d, Jury, §328. Thus, even the existence of the debtor-creditor relation does not disqualify a juror under this statute unless a party raises a challenge for

7

cause to the court. The court, not a clerk, must then determine whether the relation is that of a mere depositor of funds with a bank and not sufficient for a challenge for cause or whether it is a "non-depositor" relation which satisfies the requirement. In this case the clerks inquired about the prospective juror's relation to Norwest and dismissed them on the basis of their answers, thus effectively acting without a challenge by a party, outside the presence of opposing counsel and dismissing jurors for cause. This alone is a violation of statute. Further, the questions asked of prospective jurors, whether they had business or transactions with Norwest, did not address the proper basis for such a challenge. Numerous types of non-creditor relations fit within the term "transacting business," such as escrow, trustee account, safety deposit box holder, or conducting business for an employer. Jurors were dismissed for these non-creditor relations as well. This action is beyond the authority of a clerk acting as a jury commissioner.

Prior Montana case law indicates statutory violations of selection procedures require reversal of the verdict. In Dvorak v. Huntley Project Irrigation District (1981), 196 Mont. 167, 639 P.2d 62, this Court reversed a verdict where the departures from procedures were removal of paper slips rather than capsules from the box, failure of the clerk to shake the box before names were drawn, placement of names in a list not drawn by lot, and drawing names outside the presence of the district judge. See also Solberg v. County of Yellowstone (Mont. 1983), 659 P.2d 290, 40 St.Rep. 308. In Dvorak, 639 P.2d at 64, we cited State v. Fitzpatrick (1977), 174 Mont. 174, 180, 569 P.2d 383, 389, where the clerk performed duties delegated to the jury commissioner and judge without supervision, and stated "[t]he rule in Montana

8

is that juries must be selected and drawn in substantial compliance with the law." (Citations omitted.) Even where the only deviation was that some of the numbered slips of paper were not enclosed in capsules as required by statute, this Court held that substantial compliance with statutes was required and

> "[a]ny material deviation or departure is a denial of fundamental constitutional rights. State v. Groom, 49 Mont. 354, 359, 414 Pac. 858; State v. Tighe, 27 Mont. 327, 71 Pac. 3.
>
> ". . .
>
> "It is not the right of the individual necessarily involved, but rather the entire jury system and the selection procedures which must be protected, and when a showing is timely brought before this court we would be remiss in our duties if we permitted material deviation or departure from the procedures spelled out by the legislature." State v. District Court of Silverbow County (cited in Mont.Rpt. as State ex rel. Henningsen v. District Court) (1959), 136 Mont. 354, 360, 348 P.2d 143, 146.

The cases cited by Tribby do not support allowing a verdict to stand when there is a material deviation or departure from the jury selection procedures set by statute. In State v. Coleman (1978), 177 Mont. 1, 579 P.2d 732, the defendant contended that the clerk excused some jurors for slight or trivial causes. This Court stated that the record did not indicate the clerk had excused any jurors, and held that the jury had been selected in substantial compliance with the statutes, Coleman 579 P.2d at 747. The other cases, discussed below, deal only with the second inquiry on this issue, whether a fair and impartial jury panel was selected, and do not discuss violations or material deviations from the statutes.

The purpose of the jury selection statutes is to provide random selection of jurors from the entire panel or array, Dvorak, 639 P.2d at 64, thus securing a fair and

9

impartial jury. The jury composition may be found fundamentally unfair for reasons other than a failure to comply with the selection statutes, such as purposeful discrimination in selection because of race or permitting a juror who has a bias or prejudice to hear a case. Norwest contends that the jury in this case was not impartial because a significant group, those having business or transactions with Norwest, was excluded. However, the authority cited for this proposition, State v. Taylor (1975), 168 Mont. 142, 542 P.2d 100, discusses the statutes on selection of the jury array as unconstitutional because of discrimination based on social origin or condition. Norwest's challenge is directed at the selection of the jury panel rather than the array and does not address the constitutionality of any statute. Further, the class of people excluded does not constitute a cognizable group of constitutional dimensions. Thus, the analysis in Taylor is not applicable to the present case.

The nature of the relationship between prospective jurors and Norwest goes directly to whether the juror may be challenged for cause. Assuming there had been no statutory violations, the question would be whether Norwest had been prejudiced by the dismissal of jurors because of their association with Norwest. In Ehni v. Northern Pacific Railway Co. (1969), 152 Mont. 373, 450 P.2d 882, we held that there was no prejudicial error where a judge had dismissed four jury members because of direct or indirect associations with a party. Justice Haswell, writing for the Court stated:

> "Litigants are not entitled to have their cases tried before any particular jurors selected from the panel; their right is to reject, not select; and litigants' rights are sufficiently protected if they secure a fair and impartial jury drawn in the manner provided by law." (Citations omitted.) 450 P.2d at 885.

In this case, Norwest could not argue that the jury selected was not fair and impartial since they passed the jury for cause: They could only argue that certain panel members should have been on the jury. Montana case law has consistently held that a party has no right to have a particular member of a panel sit on a case. State v. Moran (1963), 142 Mont. 423, 384 P.2d 777 and State v. Huffman (1931), 89 Mont. 194, 296 P. 789. Thus, without the statutory violations, there would have been no reversible error in the jury selection process.

The second issue concerns rulings made by the District Court on the failure to consolidate Tribby's claims against Anderson and Norwest and the dismissal of Norwest's third party complaint against Anderson. Norwest contends that these actions by the District Court, in addition to the exclusion of Tribby's tax returns and financial statements, of his refusal to accept an offer of compromise and of his contributory negligence, prevented the jury from knowing the true cause and extent of Tribby's damages.

We first address Norwest's contention that Tribby's claims against Anderson and Norwest should have been consolidated pursuant to Rule 42(a), M.R.Civ.P. That Rule provides that claims involving a common question of law or fact may be consolidated or any of the issues may be tried jointly. Consolidation, particularly when denied, rests in the discretion of the court and will not be overturned absent a clear abuse of discretion. St. George v. Boucher (1929), 84 Mont. 158, 274 P. 489. Although there were some similar issues in both cases and consolidation may have been appropriate, we hold the District Court did not abuse its discretion by denying the motion to consolidate.

Norwest added the partnership and Anderson as third party defendants in order to try together those issues where

Tribby claimed the same damages against them. Norwest alleged contractual indemnity based on the language of the signature card as the basis for relief. The trial court dismissed the third party complaint without indicating the reasons for the dismissal. While permitting the third parties to remain in this case would not have been error, the trial court did not abuse its discretion by this action.

The District Court ruled that the contents of Tribby's tax returns for the years 1973-78 and financial statements for the years 1973-79 were not relevant to establishing the damages to Tribby. The majority rule, referred to as the "collateral source rule," is that "benefits received by a plaintiff from a source wholly independent of and collateral to the wrongdoer will not diminish the damages otherwise recoverable from the wrongdoer." 22 Am.Jur.2d, Damages, §206. This Court applied the rule in Goggans v. Winkley (1972), 159 Mont. 85, 495 P.2d 594, where the defendant contended that plaintiff's testimony regarding damages was speculative and conjectural. Defendant argued that he was prejudiced when the court did not admit evidence regarding future development near the property in dispute which would increase its value for resale and thus mitigate damages. We held that transactions between the plaintiff and others was collateral, inadmissible evidence under this rule. Tribby's tax returns and personal financial statements reflect other transactions. Tribby's financial gain from the sale of a ranch and its later repossession shown in those documents was income or profit that had no relation to this cause of action and the claimed damages. The record does not show that his increase in net worth was related to or dependent on action attributable to Norwest. Profit from a collateral transaction or an overall increase in Tribby's net worth does not mean he suffered no damage at the hands of Norwest. We

12

therefore hold that the District Court properly excluded the tax returns and financial statements insofar as they reflected collateral benefits.

Norwest attempted to introduce evidence showing they had offered Tribby the amount of the checks drawn by Anderson plus an additional sum of $4,000 in return for dismissing his lawsuit. According to Rule 408 M.R.Evid., offers of compromise are "not admissible to prove liability for or invalidity of the claim or its amount," but exclusion is not required if the evidence is offered for another purpose. An offer to compromise is not admissible when made in an attempt to effect a settlement. Continental Oil Co. v. Bell (1933), 94 Mont. 123, 21 P.2d 65. Norwest argues the offer is admissible to show that Tribby failed to mitigate damages and that Norwest did not seek to act in an oppressive or retaliatory fashion. We are not persuaded by the contention that refusing an offer to settle is a failure to mitigate damages and we find no direct authority for that proposition. Nor are we persuaded that an offer to compromise shows a prior intent or lack of intent to act in a particular fashion. Admitting this evidence would go against the basic policy of Rule 408 M.R.Evid, which is to encourage compromises and settlement of disputes. Neither party should have to fear that what takes place during negotiations will be used against them at trial. The District Court properly excluded the offers made to Tribby by Norwest.

The District Court refused to give Norwest's offered jury instruction on the duty of a depositor to examine statements and report errors within a reasonable time. Norwest argues that Tribby's negligence in not reviewing the statements was a defense that should have been submitted to the jury. Section 30-4-406, MCA requires the customer to use reasonable care to examine statements sent to him and notify

13

the bank promptly of his unauthorized signature or alterations. In the case at bar, the statements were not sent to Tribby and there was no question as to his unauthorized signature or alterations. Section 30-4-406, MCA is not authority for the offered instruction and the Judge properly refused to give it. We therefore do not reach the question raised by Norwest of the extent to which the negligence of Tribby, if any, can be a defense to his claim on the tort of breach of a duty of good faith.

In the third issue, Norwest contends that Tribby's action should have been dismissed because the partnership agreement authorized Norwest's actions, he lacked standing to sue since the cause of action was a partnership asset, and Tribby released his claim against Norwest when he reached a settlement with Anderson.

On the first contention, Norwest argues the trial court erroneously precluded it from presenting evidence that Anderson represented to Norwest that he had authority to change the signature card. The trial court refused to admit Anderson's testimony, a letter from him to Norwest on this point and that portion of the partnership agreement authorizing Anderson to write checks. This is similar to the second issue in that Norwest was prevented from presenting to the jury its theory on its authority to act and the reasonableness of its action when confronted with two disagreeing parties. This evidence was relevant to a disputed issue of fact at trial, the extent of Norwest's authority, and should not have been excluded.

Norwest also asserts that Tribby's complaint should have been dismissed because the partnership agreement authorized its action. Dismissal is proper if the plaintiff can prove no set of facts that would entitle him to relief. Rule 41(b), M.R.Civ.P. A jury may choose to find Norwest did

not have authority to act as it did. The trial court correctly refused to dismiss Tribby's complaint on this basis.

Tribby's cause of action arose, in part, from Norwest's breach of the terms of the signature card of the checking account. This account was opened prior to the time Tribby and Anderson set up their partnership. As noted above, dismissal is appropriate only when no set of facts can be proved that would entitle a plaintiff to relief. On these facts Tribby could show his cause of action was not a partnership asset, therefore the District Court properly refused to dismiss Tribby's complaint on this basis as well.

The final contention Norwest raises in this issue concerns whether Tribby released his claim against Norwest by reaching a settlement agreement with Anderson. Tribby's claims against Norwest are not based entirely on the same conduct as his claims against Anderson even though some of the resulting damages may arise from transactions involving both of them. In addition, even assuming Norwest and Anderson were joint tort feasors, any release of Anderson may specifically exclude Norwest by its terms. Kussler v. Burlington Northern, Inc. (1980), 186 Mont. 82, 606 P.2d 520. Nothing in the record indicates either a release or a non-release of Norwest.

At the time Norwest first argued against extending bad faith tort principles to this commercial area, this Court had not decided First National Bank in Libby v. Twombly (Mont. 1984), 689 P.2d 1226, 41 St.Rep. 1948. In that case, the bank customer alleged that the bank acted in bad faith when it accelerated an indebtedness and offset the amount against their checking account. The jury found both a breach of the bank's good faith obligation and false representations by the bank to the customer. This Court held that these findings,

along with the bank's possible reckless disregard of the customer's rights, would justify submitting the question of punitive damages to the jury. This Court also noted that the bank's relationship to its debtors, in light of its conduct, could justify an imposition of punitive damages. Although Twombly presented a "unique fact situation," 689 P.2d at 1230, many of the same factors may be present in the case at bar that would permit the jury to consider punitive damages. Here, the jury heard evidence on the bank's conduct that might support a finding of reckless disregard for Tribby's rights; the bank stands in the position of superior bargaining power to its customer that was noted in Twombly; and the evidence might support a finding that the bank breached an obligation to Tribby. We are not holding that every contract or statutorily imposed obligation, alone, carries with it an implied covenant of good faith and fair dealing, the breach of which permits recovery in tort. We hold only that the District Court, under these circumstances, did not err when it instructed the jury to consider recovery under tort principles and, accordingly, punitive damages.

The fifth issue concerns the proposed supplemental jury instructions Tribby submitted on November 10, 1983, the last court day before trial began. Norwest objected and moved for a continuance contending that these were, in effect, amendments to the pleadings containing new legal theories and prejudicial to its case. The court ruled there was no amendment to the pleadings and following the presentations of both sides, gave the offered instructions on breach of an implied duty of good faith and emotional damages. The

16

granting of a new trial for the reasons stated in issue (1), negates any prejudice to Norwest from unexpected jury instructions on new theories.

Norwest requested a new trial on the grounds that the jury verdict was excessive and the result of passion and prejudice. See section 25-11-102(5), MCA. It also asked that the "Certified Supplemental Record" prepared by the District Court Judge on May 15, 1984 be removed from the record. We decline to rule on the last two issues for the reason that the new trial granted on the first issue renders these questions moot.

The decisions of the District Court are hereby affirmed in part, reversed in part and the case is remanded for a new trial consistent with this opinion.

_____
Justice

We concur:

_____
Chief Justice

_____

_____

_____
Justices

17

Mr. Justice Frank B. Morrison, Jr., dissenting:

I respectfully dissent to the majority's treatment of the jury selection issue. I would affirm.

The facts stated in the majority opinion need amplification. A certified supplemental record, consisting of an affidavit from the trial judge, sets forth the correct facts with respect to the jury selection process. Because I deem them essential, I quote that affidavit verbatim:

> "I, JOHN M. McCARVEL, Judge of the District Court of the Eighth Judicial District of the State of Montana, hereby certify that after the jury panel in the above-entitled matter was excused for cause on September 26, 1983, I made certain statements concerning the procedure to be followed by the Clerk of Court when attempting to assemble the next jury panel for this cause. I stated that I did not want to have the same problem arise again and then instructed the Clerk that when she attempted to telephone the prospective jurors at the time of the next trial, she was to inquire of the prospective jurors as to their relationship, if any, with the Defendant Bank. At the time I so instructed the Clerk, I did so from the bench while attorneys for both parties, the Clerk of Court, and the Court Reporter were still present. When I gave that instruction to the Clerk, I did so in a voice loud enough to be heard by all those present in the Courtroom. At the time I gave that instruction to the Clerk, none of the attorneys present objected to the instruction to quiz the prospective jurors as to their relationship with the Defendant Bank nor did any attorney ever object to that instruction. At no time on September 26, 1983 or at any time thereafter did I ever tell any of the attorneys for either of the parties that I intended to rescind my instruction to the Clerk of Court.

> "DATED this __15__ day of May, 1984.

> JOHN M. McCARVEL
> District Court Judge"

It is true that the statutory change in § 25-7-223(3)(b), MCA, made it clear that a depositor relationship with Bank did not mandatorily disqualify a juror from sitting in a case involving Bank. However, the district judge was still free to determine that those in such a close relationship with Bank would not be allowed to sit on the panel. The District Court here was acting properly in instructing the clerk to disqualify such people from the panel

18

and, absent a showing of prejudice by Bank, the remaining panel would not be objectionable on the basis that depositors were excluded.

Even if we assume arguendo that there was some error that occurred when the clerk excused certain jurors, reversible error does not result, or at least did not under prior rulings of this Court.

In State v. Moran (1963), 142 Mont. 423, 384 P.2d 777, this Court held that the absence of certain members of the jury panel at the time voir dire was conducted and the jury selected, did not constitute reversible error. The Court noted that if there was error, the error had nothing to do with the original acquisition of the panel and therefore prejudice had to be shown. The Moran decision cited State v. Huffman (1931), 89 Mont. 194, 198, 296 P. 789, 790, for the proposition that:

> "The right to challenge is the right to reject, not to select, a juror; no person can acquire a vested right to have any particular member of a panel sit upon his case unless and until such member has been accepted and sworn. Prejudice is not presumed from error. . . ." (Emphasis supplied.) 142 Mont. at 447, 384 P.2d at 790.

Likewise, in Ehni v. Northern Pacific Railway Co. (1969), 152 Mont. 373, 450 P.2d 882, we held that where a judge dismissed four jury members, after voir dire, because of their association with one of the parties, there was no prejudicial error absent a showing that the resultant jury was anything but fair and impartial.

In the case at bar the majority concedes that appellant has failed to show that the impaneled jury was defective. Therefore, in line with prior precedent, no reversible error should be found.

Common practice in Montana has been for the jurors to file in, talk with the trial judge and be excused. From time to time objections to this procedure have been lodged. The

19

most recent case concerning this practice is State v. Stroud (Mont. 1984), 683 P.2d 459, 41 St.Rep. 919. In that case the trial court, in the absence of counsel and prior to voir dire examination, excused two prospective jurors. Defendant claimed error on appeal. Justice Gulbrandson, writing for the majority said:

> "In reaching this conclusion, we are not suggesting that the trial judge's essentially educational examination should be adopted by other district judges. Nor are we suggesting that the judge's method of examination was the best one. Certainly a record of any such proceedings should be maintained. Here, we conclude only that there is no credible evidence of prejudice to the defendant Stroud." (Emphasis supplied.) Stroud, 683 P.2d at 464, 41 St.Rep. at 924.

In State v. Coleman (1978), 177 Mont. 1, 579 P.2d 732, 200 jurors were drawn according to statute. However, the District Court clerk was then allowed to inquire by telephone regarding which of those jurors would be available for trial. The District Court clerk excused 139 jurors and selected 61 who apparently answered they would be available. There was no statutory authority for the District Court clerk to so act. There is no record of why the clerk selected the 61 jurors who eventually were called to the courthouse. While the majority opinion in Coleman is quite unclear in its treatment of this issue, the Court apparently found no error because Coleman was unable to show prejudice.

A case quite analogous to the case at bar is Kinty v. United Mine Workers of America (4th Cir. 1976), 544 F.2d 706. In that case the trial judge, approximately two and one-half weeks prior to trial, advised all parties he was instructing the clerk to inquire of the prospective jurors whether they had any "connection with the mining industry" and to remove from the jury list any who answered in the affirmative.

In commenting on that action, the Fourth Circuit stated:

> "Even were the objection not out of time, we are by no means convinced that the trial judge's ruling

20

could be assigned as error. Unquestionably the issues in these cases were matters on which all persons in the mining industry have strong and fixed opinions. It is extremely doubtful that under any circumstances such persons could be considered impartial and unbiased in considering and deciding the issues in these cases. Given the discretion available to the trial judge in determining the qualification of jurors, it would be difficult to find a clear abuse of discretion in the action of the trial judge." (Footnote omitted.) Kinty, 544 F.2d at 723.

In State v. Reilly (N.D. 1913), 141 N.W. 720, the North Dakota Supreme Court noted that a trial court has no right to arbitrarily discharge regular panel members without cause. Nevertheless, the North Dakota Court held such practice was not reversible error and said:

"[B]ut the cases which hold to this proposition fall far short of holding that error is committed where a court, for reasons of its own, has discharged a portion of a panel and either provided for the calling of talesmen or for an additional panel to fill the vacancies, especially where there is no proof or suggestion of partiality on the part of such court, or of any real prejudice to the defendant. The real thing to be guarded against is the denial of an impartial jury of one's peers. . . ." Reilly, 141 N.W. at 723.

The law in Montana has been that we will only apply a per se rule requiring reversal without a showing of prejudice where there is error in selection of the array itself. Dvorak v. Huntley Project Irrigation District (1981), 196 Mont. 167, 639 P.2d 62. I questioned the wisdom of our decision in Dvorak and corrective legislative action was subsequently taken. Nevertheless, there arguably is some justification in applying sanctions for failure to follow statutory procedures in selection of the array itself. One can argue that the makeup of a jury panel can be skewed to eliminate certain elements from the panel and that a rule calling for per se reversal has a desirable prophylactic effect. However, if the panel selected is constitutionally sound, there seems to be no reason for reversal. Perhaps our decision in Dvorak was unsound.

21

The majority has here chosen to take a questionable decision, corrected legislatively, and for the first time expand the decision to embrace the elimination of prospective jurors from a panel selected properly. I can only conclude that the majority wished to reverse a jury verdict with which they disagreed. This result-oriented appellate decision-making continues to contribute to a chaotic legal process in which lawyers, litigants and trial judges find themselves playing Russian roulette.

I respectfully submit that the verdict for plaintiff, together with the judgment entered thereon, should be affirmed.

Justice

Mr. Justice William E. Hunt, Sr. dissenting:

I dissent. I believe that the District Court was correct in its rulings during this trial and should be affirmed in every respect.

_____
                        Justice

Mr. Justice John C. Sheehy, dissenting:

As I read the majority opinion, it reverses the District Court on two grounds, 1) improper deviation in the selection of the jury panel, and 2) the District Court excluded evidence that would prove Norwest's authority to act and the reasonableness of its actions. I disagree with the majority on both grounds.

It is of course true that the clerk, instructed by the Court, deviated from the statutory procedures in getting the jury panel. What was the result? The clerk excluded those prospective jurors who had a debtor-creditor or business relation with Norwest. No reasonable lawyer, and I hope, no reasonable court, would have expected that depositors or lenders from Norwest could have been permitted to act on this case as jurors. The purpose of the statutes on jury selection, and the objective of courts construing those statutes, is to provide a fair jury panel. The deviation from the statutes by the clerk did not in this case deprive the parties of a fair jury panel. Instead it insured a fair panel. That fact is evinced in that counsel for Norwest, after interrogating the members of the panel, passed the jury for cause. Norwest recognized it had a fair jury at the outset of the trial. If error occurred here, it was harmless error.

On the second point, it is irrelevant to the case the Anderson represented to Norwest that he had authority to change the signature card that Tribby had originally signed, outside of Tribby's presence or knowledge that the change had occurred. That kind of evidence is in the category used by Eve, when she said, "The serpent made me do it." Norwest had

24

a contract with Tribby that was contained on the signature card.    It had no business or right to change Tribby's contract unilaterally and without his knowledge.    Norwest's dealings with Anderson without Tribby are inexcuseable, and form no defense to Tribby's suit.

I dissent.

_____
John C. Sheehy
Justice