[No. 11965-0-II. Division Two. February 13, 1990.]

RAYMOND BADGETT, ET AL, *Appellants,* v. SECURITY STATE BANK, *Respondent.*

REED, J., concurs by separate opinion.

*Warren J. Daheim* and *Gordon, Thomas, Honeywell, Malanca, Peterson & Daheim,* for appellants.

*Joshua J. Preece* and *Bogle & Gates,* for respondent.

PETRICH, J.—Raymond and Audrey Badgett appeal summary judgments dismissing their action for damages against Security State Bank, awarding the Bank judgment on its loan to them, and permitting foreclosure on their property. We find that the evidence presented raises material issues of fact concerning the Bank's duty to the Badgetts and so remand the case for trial.

The Badgetts' relationship with Security State began in 1980, when they transferred their business from Rainier Bank and borrowed $476,000 from Security State to pay off loans at Rainier and to provide for operating expenses. The contracts for that term loan and later loans had 1–year call or maturity dates, but they were amortized over 5 to 10 years. According to the Badgetts' first loan officer, that was

a fairly typical practice for agricultural loans, allowing the contracts to be reexamined and "reworked" each year in light of changing circumstances.

The record contains considerable evidence of such restructuring activities, the most significant of which took place in 1984. At that time, because of Raymond Badgett's poor health, the Badgetts decided to quit the dairy business. After some negotiations, the Bank agreed to modify the loan contract to permit the Badgetts to take part in a government termination program and to liquidate their assets over a 1–year period.

Later that year, however, the Badgetts changed their minds; there were further negotiations, and in the spring of 1985, the Bank agreed to a new loan and other restructuring to allow the Badgetts to continue in business. The new contract covered a debt of $1,050,000, secured by the Badgetts' dairy herd and their various properties.

Thereafter, following further difficulties, the Badgetts again decided to quit the dairy business. They hoped to facilitate their liquidation by taking advantage of a federal dairy termination program. Under this new program, participants were selected on the basis of bids, and they were required to keep their facilities out of milk production for 5 years. The Badgetts proposed to bid $18 per hundredweight of milk production, for which they expected to receive $1,600,000. Because they would need some money for other loans and the expenses of maintaining the dairy facilities for 5 years until they could be sold, the Badgetts did not feel they could pay off their entire loan to the Bank with the proceeds from the termination program.

On March 3, 1986, they met with their current loan officer, Joe Cooke, the Bank's attorney, and their own attorney to discuss participation in the program. They initially asked that the Bank accept 80 percent of the money owed and forgive the remainder. When Cooke rejected that proposal, they offered to pay the Bank 80 percent of the loan balance in cash and either (1) give the Bank a security interest in their land (which had an appraised value of $2 million);

(2) deed to the Bank a parcel or parcels of land to equal the other 20 percent; or (3) sell off one or more of the four parcels which did not contain dairy facilities and pay the other 20 percent of the loan.[1]

Raymond Badgett and his attorney testified by deposition that Cooke and Security State's lawyer, John Hall, told them that their proposals would be presented to the loan committee. However, according to four members of that committee, Cooke told them only that Badgett was asking for a 20 percent discount of the loan, and that it was a "take it or leave it" proposition.

The committee rejected that proposal. The Badgetts were told that the Bank was not interested in compromising its collateral. In order to obtain the money they needed to pay off the entire loan and still retain operating funds, they submitted a bid of $25.89 per hundredweight. The government rejected that bid, accepting bids of $22.50 or less. Shortly thereafter, the Badgetts defaulted, and the Bank sold their herd and machinery for $374,447.85.

The Badgetts commenced an action against the Bank for damages and the Bank counterclaimed for a judgment for the moneys owing. By summary judgment, the court dismissed the Badgetts' claims, awarded the Bank $1,333,267.48, plus attorneys fees and costs, and ordered foreclosure on the Badgetts' property. We hold that it was error to decide these issues as a matter of law.

When reviewing the trial court's decision on a summary judgment, this court engages in the same inquiry as the trial court. *Wilson v. Steinbach,* 98 Wn.2d 434, 437, 656 P.2d 1030 (1982). The motion should be granted only if there is no genuine issue of material fact. *Hontz v. State,* 105 Wn.2d 302, 311, 714 P.2d 1176 (1986). There were several such issues here.

---

[1]They were required by the termination program only to hold onto the land containing the actual dairy facilities. Raymond Badgett testified that the rest of the land could be used for pasture or crops. However, Badgett had had some of these parcels on the market for some time, without success.

■ The most important among them pertain to the scope of the Bank's duty to the Badgetts. Every contract imposes an obligation of good faith in its performance. This requirement of contractual fair dealing is found in section 1–203 of the Uniform Commercial Code, RCW 62A.1–203. The transaction here is at least partially encompassed by Article 9 of the Code because the loan was secured by the livestock, equipment and inventories of the dairy farm, in addition to the land itself.[2] Moreover, because the U.C.C. reflects many principles of contract law which are also applicable to the making and performance of agreements governed by other laws, the Code has often been used as an analogy to situations that are not explicitly covered by its provisions. *See Liebergesell v. Evans,* 93 Wn.2d 881, 892, 613 P.2d 1170 (1980) (applying principles of good faith to the making of promissory notes); *Nevada Nat'l Bank v. Huff,* 94 Nev. 506, 582 P.2d 364 (1978) (applying concept of unconscionability and course of dealing to vehicle leases); and *Sunco Mfg. Co. v. Hargrove,* 581 P.2d 925 (Okla. Ct. App. 1978) (U.C.C. provision regarding notification of acceptance of a contract applied to mechanics' lien and waiver). It is appropriate to consider U.C.C. principles in this case.

■ The requirement of good faith dealing is the single most important concept intertwined throughout the entire Uniform Commercial Code. *Schroeder v. Fageol Motors, Inc.,* 86 Wn.2d 256, 262, 544 P.2d 20 (1975). A bank has a duty of good faith to its customers, including borrowers. *Warren v. Washington Trust Bank,* 19 Wn. App. 348, 367, 575 P.2d 1077 (1978), *modified on other grounds,* 92 Wn.2d 381, 598 P.2d 701 (1979). As Security State maintains, this duty of good faith does not require a party to accept a material change in the terms of its contracts. *Betchard–*

---

[2]Under RCW 62A.9–102(1), Article 9 is applicable to: "any transaction (regardless of its form) which is intended to create a security interest in personal property or fixtures including goods, documents, instruments, general intangibles, chattel paper or accounts; . . .". It is not applicable to the creation or transfer of an interest in or a lien on real estate. RCW 62A.9–104(j).

*Clayton, Inc. v. King,* 41 Wn. App. 887, 890, 707 P.2d 1361 (1985). However, the scope of the good faith obligation can be expanded by the conduct of a contracting party which gives rise to reasonable expectations on the part of the other party. *See Liebergesell v. Evans,* 93 Wn.2d 881, 891–92, 613 P.2d 1170 (1980). Such expectations can result from a course of dealing, defined in RCW 62A.1–205(1) as

> [A] sequence of previous conduct between the parties to a particular transaction which is fairly to be regarded as establishing a common basis of understanding for interpreting their expressions and other conduct.

A course of dealing can include consistent failure to enforce specific contract requirements, *Central Wash. Prod. Credit Ass'n v. Baker,* 11 Wn. App. 17, 521 P.2d 226 (1974) (course of conduct acquiescing in sale of cattle without written consent raises fact question re waiver of the requirement); *Dunn v. General Equities of Iowa, Ltd.,* 319 N.W.2d 515 (Iowa 1982) (right to enforce an acceleration clause in an installment note can be waived by a course of dealing accepting late payments); a pattern of conducting transactions in a given way, *In re Samuels & Co.,* 526 F.2d 1238 (5th Cir. 1976) (evidence of course of dealing showing past conduct of transactions in manner consistent with the Packers and Stockyards Act supported view that sales to meat packer were cash sales); *Peck v. Augustin Bros. Co.,* 203 Neb. 574, 279 N.W.2d 397 (1979) (course of dealing indicated that parties conducted cattle transactions in a certain way and intended sale in question to be no different); and past willingness to allow for modification of performance, *Luedtke Eng'g Co. v. Indiana Limestone Co.,* 740 F.2d 598 (7th Cir. 1984) (evidence of prior dealings showed that buyer was willing to accept late deliveries of limestone from time to time); *Neal–Cooper Grain Co. v. Texas Gulf Sulphur Co.,* 508 F.2d 283 (7th Cir. 1974) (course of dealing shows buyer's willingness to modify place of delivery); *Farmers Elevator Co. v. Anderson,* 170 Mont. 175, 552 P.2d 63 (1976) (conduct shows willingness to accommodate elevator's needs to modify delivery dates).

More specifically, our Supreme Court has held that evidence the parties contemplated future developments relating to a waterfront restaurant may have given rise to an obligation to consider development proposals. *Metropolitan Park Dist. v. Griffith*, 106 Wn.2d 425, 723 P.2d 1093 (1986). In this case, there was evidence that the Bank anticipated changes in its clients' situation and routinely restructured agricultural loans to meet the requirements of these changing circumstances. There was evidence that this had been the pattern of its relationship with the Badgetts for 6 years, even resulting in the Bank's agreement to a similar liquidation proposal in 1984. The final loan agreement, itself, indicated the possibility of amendments.[3] This was enough evidence to support a reasonable inference that the parties' course of dealing had created a good faith obligation on the part of the Bank to consider the Badgetts' proposals.[4] The existence of a course of dealing or performance is a question of fact. *Central Wash. Prod. Credit Ass'n v. Baker*, 11 Wn. App. at 20–21. It should have been submitted to a jury.

 The existence of good faith is likewise a jury question. *Reid v. Key Bank of S. Maine, Inc.*, 821 F.2d 9, 15 (1st Cir.), 3 U.C.C. Rep. Serv. 2d 1665 (1987); *Murdaugh Volkswagen, Inc. v. First Nat'l Bank of S. Carolina*, 801 F.2d 719 (4th Cir.), 2 U.C.C. Rep. Serv. 2d 25 (1986). It is defined as honesty in fact in the conduct or transaction concerned. RCW 62A.1–201(19). It can be violated, *inter alia*, (1) by lying to the other party, *Kammerer v. Western*

---

[3]The 1985 agreement stated, in part: "Additional advancements or increased commitments for any purpose are not contemplated at this time. However, if such advances or commitments are made within the duration of this Agreement, each such advance or commitment shall be subject to the terms and conditions of this Agreement *as may be amended . . .*". (Italics ours.)

[4]This determination is *not to be construed as imposing an obligation to mod*ify this or any contract. Rather, the Bank's freedom to reject the Badgetts' proposals is relevant to the question of whether the failure to consider them was the proximate cause of the Badgetts' losses. This is also a question for the jury. *Lettengarver v. Port of Edmonds*, 40 Wn. App. 577, 581, 699 P.2d 793 (1985).

*Gear Corp.*, 27 Wn. App. 512, 525, 618 P.2d 1330 (1980), *aff'd*, 96 Wn.2d 416, 635 P.2d 708 (1981) (*Western Gear* obtained license by promising to pay royalties); *see also Elizarraras v. Bank of El Paso*, 631 F.2d 366 (5th Cir. 1980) (bank assured customer check would be honored, then dishonored it); *First Nat'l Bank in Libby v. Twombly*, 213 Mont. 66, 689 P.2d 1226 (1984) (loan officer assured borrower that he would be able to extend his loan; vice–president denied having been told about that arrangement and refused to agree to it) and, (2) by retaliation against a customer, *Tribby v. Northwestern Bank of Great Falls*, 217 Mont. 196, 704 P.2d 409 (1985).

There was substantial evidence in the record indicating that Joe Cooke and Security's attorney told the Badgetts that their proposals would be presented to the loan committee; that Cooke had, in fact, paid very little attention to the discussion of those proposals,[5] had taken no notes, and had told the loan committee that the Badgetts wanted 20 percent of their loan forgiven and were not willing to negotiate the matter. There was also some indication of hostility between Cooke and the Badgetts. This was clearly enough evidence to raise a question of fact concerning whether or not Cooke had conducted his dealings with the Badgetts in good faith. Summary judgment was thus improper. It is reversed, and the case is remanded for trial.

ALEXANDER, C.J., concurs.

REED, J. (concurring)—I concur, except for that portion of the opinion that appears to import the U.C.C. into our resolution of the good faith dealing issue. It is far from clear that the U.C.C. provision governs the underlying

---

[5]According to Cooke's own deposition, he "got tired of listening" because the lawyers were exceeding the scope as far as he was concerned. He said the other proposals "must have flown clear by [him]." However, he also said that he remembered a discussion of additional real estate liens to cover the other 20 percent of the loan.

contract, even though the bank held an Article 9 security interest.

We need only cite to *Metropolitan Park Dist. v. Griffith,* 106 Wn.2d 425, 437, 723 P.2d 1093 (1986), for the proposition that:

> In every contract there is an implied covenant of good faith and fair dealing which obligates each party "to cooperate with the other so that [each] may obtain the full benefit of performance.'" *Lonsdale v. Chesterfield,* 99 Wn.2d 353, 357, 662 P.2d 385 (1983) (quoting *Miller v. Othello Packers, Inc.,* 67 Wn.2d 842, 844, 410 P.2d 33 (1966)).

Review granted at 114 Wn.2d 1020 (1990).