[No. 56993–2. En Banc. March 28, 1991.]

RAYMOND BADGETT, ET AL, *Respondents,* v. SECURITY STATE BANK, *Petitioner.*

*Bogle & Gates, Delbert D. Miller,* and *Joshua J. Preece,* for petitioner.

*Gordon, Thomas, Honeywell, Malanca, Peterson & Daheim,* by *Warren J. Daheim,* for respondents.

*Daniel B. Ritter* on behalf of Washington Bankers Association; *John J. Gill, Michael F. Crotty,* and *Thomas J. Greco* on behalf of American Bankers Association, amici curiae for petitioner.

DURHAM, J.—Raymond and Audrey Badgett (the Badgetts) brought an action for damages against Security State Bank (the Bank) after the Bank refused to restructure their agricultural loans. The trial court granted summary judgment in favor of the Bank and dismissed the claims. It also granted the Bank summary judgment on its counterclaims for monies due and entered a decree of foreclosure. The Court of Appeals reversed and remanded for trial, holding that the Bank may have had a good faith duty to consider the Badgetts' proposals for restructuring the loan. We reverse the Court of Appeals and reinstate the trial court's dismissal of the damages claims and entry of the decree of foreclosure.

In 1981, the Badgetts borrowed $476,000 from the Bank for their dairy operation. $336,000 of this amount was an intermediate term loan, and the remaining $140,000 was for operating expenses. The contract for the term loan had a 1–year call or maturity date, but was amortized over 5 to 10 years. According to the Badgetts' first loan officer, it was a fairly typical practice for agricultural loans to be re-examined yearly to recap collateral positions, update financial statements, and make projections for the coming year.

In 1984, the Badgetts decided to quit the dairy business. They asked the Bank for assistance in restructuring their loans so they could liquidate their assets and participate in a government diversion program. After a series of negotiations, the parties agreed to a liquidation plan, evidenced by a new promissory note, a security agreement and general pledge, and a security agreement for crops, livestock, and farm products.

In May 1985, the Badgetts decided to re–enter the dairy business and they requested new financing. The Bank sent a letter to the Badgetts asking for additional financial information and indicating that, in the event new financing was agreed to, a written loan agreement would be required. On September 5, 1985, after a series of negotiations, the parties executed a loan agreement and new promissory note in the amount of $1,050,000. The loan agreement was secured by livestock, equipment, feed inventories, and junior liens on all real estate. It expressly provided that "[a]dditional advances or increased commitments for any purpose *are not contemplated* at this time" (italics ours), and that the written agreement "contains the entire loan agreement between Borrower and Security State Bank with respect to the loan transaction." Clerk's Papers, at 134–35.

In early 1986, the Badgetts again decided to retire from the dairy business and considered participating in the federal government's Dairy Termination Program (DTP). Under this program, participants were selected on the basis of bids, and they were required to keep their milk facilities out of production for 5 years. The Badgetts had considered entering a bid of $18 per hundredweight of milk production, for which they could have expected to receive $1,600,000.

On March 3, 1986, the Badgetts and their attorney, Rene Remund, met with their current loan officer, Joe Cooke, and the Bank's attorney, John Hall. The Badgetts initially proposed that the Bank accept $1,300,000, part of the amount they expected to receive through participation in the DTP, in satisfaction of the $1,500,000 debt and forgive the remaining $200,000. Cooke declined to accept this proposal. The parties then discussed the possibility of sale of the cattle at auction. They also discussed the possibility of deferring payment of $200,000, with the Bank releasing its existing collateral and accepting unspecified real estate to secure the remaining debt. No specific parcel was proposed, and neither terms of repayment nor interest rate were discussed. Cooke was to meet with the loan committee and get

back to the Badgetts with an answer. The Badgetts left the meeting knowing that an agreement had not been reached and further negotiations were necessary.

Cooke then met with the loan committee of the Bank. The Bank did not accept the Badgetts' proposal and did not make an offer. The Badgetts contend that Cooke misrepresented their offer by presenting it to the committee as non–negotiable. Gail Shaw, who was a member of the loan committee, stated that his impression, which he got from Cooke, although "[n]ot by specific words", was that the Badgetts' proposal was non–negotiable. His impression was based in part on the fact that the Badgetts were operating under a tight time frame because bids for participation in the DTP were due by March 7. Thus, there was not really time to negotiate about the $18 bid underlying the proposal. Shaw also stated that he was disappointed that the Badgetts had not made a formal proposal because the proposal was "not conveyed clearly to [Cooke]", and Shaw "ha[d] to admit [from reading the notes of the meeting] that it appears that [Cooke] didn't understand [the proposal]." On March 7, the Badgetts submitted a bid to the DTP of $25.89 per hundredweight.

On March 28, 1986, they learned that their bid to the DTP was not accepted. Prior to that time, the Badgetts had made their loan payments according to the terms of the note. However, on April 3, 1986, their loan payment was for less than the agreed amount and they stopped making payments thereafter. On April 14, 1986, the Badgetts and the Bank entered into a written agreement to auction certain collateral. The sale of the herd and machinery realized net proceeds of $374,447.85.

On September 11, 1986, the Badgetts filed a complaint against the Bank for $2 million in damages alleging, in part, that the Bank had unreasonably refused permission for the Badgetts to participate in the DTP. They also made a Consumer Protection Act (CPA) claim. The Bank filed a counterclaim for payment of monies due and foreclosure. The trial court granted summary judgment to the Bank,

dismissing the Badgetts' claims, ruling that the Bank was under no duty to negotiate and that a prior course of conduct cannot create a new obligation on the part of the Bank. The court also granted the Bank summary judgment on its counterclaims and entered a decree of foreclosure.

The Court of Appeals reversed and remanded for trial stating that there was "enough evidence to support a reasonable inference that the parties' course of dealing had created a good faith obligation on the part of the Bank to consider the Badgetts' proposals" and that the existence of a course of dealing and good faith are issues of fact. *Badgett v. Security State Bank,* 56 Wn. App. 872, 878, 786 P.2d 302 (1990). The court cautioned that its holding was "not to be construed as imposing an obligation to modify this or any contract. Rather, the Bank's freedom to reject the Badgetts' proposals is relevant to the question of whether the failure to consider them was the proximate cause of the Badgetts' losses." *Badgett,* at 878 n.4. This court granted the Bank's petition for review.[1]

In reviewing an order of summary judgment, this court engages in the same inquiry as the trial court. Summary judgment is proper if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Wilson v. Steinbach,* 98 Wn.2d 434, 437, 656 P.2d 1030 (1982). The Badgetts contend that the Bank had a duty to consider their proposal and that the Bank breached that duty because Cooke inaccurately relayed their proposal to the loan committee. Thus, the threshold question is whether or not, as a matter of law, the Bank had a duty to consider the proposal. If not, the manner in which the proposal was conveyed or considered is not a

---

[1] In addition to their affirmative defenses, the Badgetts argued to both the trial court and the Court of Appeals that summary judgment was not proper on the Bank's counterclaims because the Bank had a duty to mitigate its damages by working with the Badgetts on their proposal to participate in the DTP. The trial court ruled against the Badgetts on this issue. Because it was not discussed by the Court of Appeals, and neither party has argued it in connection with the petition for review, we do not reach it here.

material fact. *See Allied Sheet Metal Fabricators, Inc. v. Peoples Nat'l Bank*, 10 Wn. App. 530, 536 n.5, 518 P.2d 734 (facts plaintiff alleged showed lack of good faith on the part of Bank in manner it collected demand notes were not material because they raised no factual issue as to Bank's right to declare the notes due and owing and to collect the funds), *review denied*, 83 Wn.2d 1013, *cert. denied*, 419 U.S. 967 (1974).

The Badgetts do not contend that any express term in the loan agreement required the Bank to consider their proposal. Nor do they argue that the Bank was under any obligation to modify the agreement. Rather, they assert that the Bank was obligated by the duty of good faith implicit in every contract to affirmatively cooperate with them in their efforts to participate in the DTP and restructure their loan. The duty of good faith is not as broad as the Badgetts suggest.

There is in every contract an implied duty of good faith and fair dealing. This duty obligates the parties to cooperate with each other so that each may obtain the full benefit of performance. *Metropolitan Park Dist. v. Griffith*, 106 Wn.2d 425, 437, 723 P.2d 1093 (1986); *Lonsdale v. Chesterfield*, 99 Wn.2d 353, 357, 662 P.2d 385 (1983); *Miller v. Othello Packers, Inc.*, 67 Wn.2d 842, 844, 410 P.2d 33 (1966). However, the duty of good faith does not extend to obligate a party to accept a material change in the terms of its contract. *Betchard–Clayton, Inc. v. King*, 41 Wn. App. 887, 890, 707 P.2d 1361, *review denied*, 104 Wn.2d 1027 (1985). Nor does it "inject substantive terms into the parties' contract". Rather, it requires only that the parties perform in good faith the obligations imposed by their agreement. *Barrett v. Weyerhaeuser Co. Severance Pay Plan*, 40 Wn. App. 630, 635 n.6, 700 P.2d 338 (1985). Thus, the duty arises only in connection with terms agreed to by the parties. *See Matson v. Emory*, 36 Wn. App. 681, 676 P.2d 1029 (1984); *Lonsdale v. Chesterfield*, 99 Wn.2d 353, 662 P.2d 385 (1983); *CHG Int'l, Inc. v. Robin Lee, Inc.*, 35 Wn. App. 512, 667 P.2d 1127, *review denied*, 100 Wn.2d

1029 (1983); *Miller v. Othello Packers, Inc.*, 67 Wn.2d 842, 843–44, 410 P.2d 33 (1966).[2]

By urging this court to find that the Bank had a good faith duty to affirmatively cooperate in their efforts to restructure the loan agreement, in effect the Badgetts ask us to expand the existing duty of good faith to create obligations on the parties in addition to those contained in the contract—a free–floating duty of good faith unattached to the underlying legal document. This we will not do. The duty to cooperate exists only in relation to performance of a specific contract term. *See Cavell v. Hughes,* 29 Wn. App. 536, 629 P.2d 927 (1981); *Long v. T–H Trucking Co.,* 4 Wn. App. 922, 926, 486 P.2d 300 (1971). As a matter of law, there cannot be a breach of the duty of good faith when a party simply stands on its rights to require performance of a contract according to its terms. *Allied Sheet Metal,* 10 Wn. App. at 535–36; *accord, Creeger Brick & Bldg. Supply Inc. v. Mid–State Bank & Trust Co.,* 385 Pa. Super. 30, 560 A.2d 151 (1989). The Badgetts received the full benefit of their contract when they received the amount of money they bargained for at the agreed rate of interest for the agreed period of time. *See Layne v. Fort Carson Nat'l Bank,* 655 P.2d 856 (Colo. Ct. App. 1982) (good faith requirement of the U.C.C. not violated when Bank stood on its rights under security agreement by refusing to consent to plaintiff's sale of collateral and assumption by purchasers of existing terms of note unless purchasers would agree

---

[2]The Court of Appeals relied on *Liebergesell v. Evans,* 93 Wn.2d 881, 613 P.2d 1170 (1980), to assert that "the scope of the good faith obligation can be expanded by the conduct of a contracting party which gives rise to reasonable expectations on the part of the other party." *Badgett,* 56 Wn. App. at 877. *Liebergesell* is not on point, and more importantly, does not support the broad conclusion stated by the Court of Appeals. In *Liebergesell,* defendants entered into a contract with plaintiffs to borrow money at interest rates, proposed by the defendants, which defendants knew were illegal and unenforceable. The court stated that the law cannot allow contracting parties to deceive one another when there is a duty to act in good faith. *Liebergesell,* at 891–92. *Liebergesell* held only that "the duty to disclose relevant information to a contractual party [during negotiation] *can* arise as a result of the transaction itself within the parties' general obligation to deal in good faith." (Footnote omitted.) *Liebergesell,* at 893.

to a 5 percent increase in the interest rate); *Creeger,* at 37 (a lender is generally not liable for harm caused to a borrower by refusing to advance additional funds, release collateral, or assist in obtaining additional loans from third persons).

The Badgetts rely on *Metropolitan Park Dist. v. Griffith, supra,* to support their assertion that the Bank had a good faith obligation to consider their proposals. *Metropolitan Park* provides little, if any, support for the existence of such a duty in these circumstances. In *Metropolitan Park,* a park district entered into an agreement with Hal E. Griffith, granting him concession rights in parks owned or controlled by the District. Griffith made numerous proposals to the District to persuade it to allow Griffith to serve alcohol in a restaurant he operated under the contract. The District declined to permit alcohol. *Metropolitan Park,* at 429.

Griffith brought a claim for breach of contract, asserting that the implied duty of good faith in every contract obligated the District to consider his proposals on the merits. *Metropolitan Park,* at 437. This court stated that "under its implied covenant of good faith, the District *may* have had an implicit obligation to consider Griffith's proposals for changes and improvements." (Italics ours.) *Metropolitan Park,* at 437. However, the court declined to decide the issue because, even if such a duty existed, the evidence did not support Griffith's assertion that the park district had not considered his proposals. *Metropolitan Park,* at 437.

More importantly, the language quoted above was tied directly to the circumstances of that case: "Although the parties to [the] agreement did not anticipate that the future development which Griffith had initially proposed would necessarily occur, they did contemplate such development" when they entered into the agreement. *Metropolitan Park,* at 437. In contrast, there is no evidence in the present case that the parties contemplated that the Badgetts would seek a restructuring of the agreement to facilitate another attempt to quit the dairy business. Indeed, as already noted, the loan agreement expressly states that it

constitutes the entire agreement between the parties and no additional advances or increased commitments were contemplated for any purpose.

The Bank and the Badgetts entered into a written loan agreement. While the parties may choose to renegotiate their agreement, they are under no good faith obligation to do so.[3] The duty of good faith implied in every contract does not exist apart from the terms of the agreement.

The Badgetts next contend that because the Bank had anticipated changes in the Badgetts' financial situation and had been flexible in dealing with them in the past, the parties' course of dealing had created a good faith obligation on the part of the Bank to consider the Badgetts' proposals. However, a course of dealing does not override express terms in a contract or add additional obligations. Rather, it is a tool for interpreting the provisions of a contract.

The concept of relying on the parties' course of dealing to interpret contract provisions is found in the Uniform Commercial Code (U.C.C.). The U.C.C. has been applied by analogy to contracts not explicitly covered by its provisions. *See Liebergesell v. Evans,* 93 Wn.2d 881, 892, 613 P.2d 1170 (1980). RCW 62A.1–205(1) defines a course of dealing as:

> a sequence of previous conduct between the parties to a particular transaction which is fairly to be regarded as establishing a common basis of understanding for *interpreting* their expressions and other conduct.

(Italics ours.) *See also Schaller v. Marine Nat'l Bank,* 131 Wis. 2d 389, 388 N.W.2d 645 (course of dealing is a tool for interpreting existing contract), *review denied,* 393 N.W.2d

---

[3]As pointed out in the amicus brief filed by counsel on behalf of the Washington Bankers Association and the American Bankers Association, a duty to consider proposals might easily lead to a duty to negotiate such proposals. This, in turn, will increase transaction costs for the parties and decrease economic efficiency. More importantly, it may operate to relieve a party of its obligations under an otherwise valid contract. Any request for modification would impose a duty to negotiate, which would then open the door for factual allegations of a lack of good faith in negotiating.

297 (1986). Under RCW 62A.1–205(4), the express terms of an agreement and an applicable course of dealing "shall be construed wherever reasonable as consistent with each other". However, when such construction is unreasonable, express terms control. RCW 62A.1–205(4). *See also Flagship Nat'l Bank v. Gray Distrib. Sys., Inc.,* 485 So. 2d 1336, 1340 (Fla. Dist. Ct. App.), *review denied,* 497 So. 2d 1217 (Fla. 1986). Thus, the trial court was correct in concluding that prior course of conduct cannot create a new obligation on the part of the Bank. Report of Proceedings, at 50.

Because the Badgetts are not asking this court to interpret any provision in the loan agreement as imposing a duty on the Bank to consider their proposals, facts relating to prior dealings between the Badgetts and the Bank are not material for the purpose of defeating the Bank's motion for summary judgment.[4]

---

[4]The Court of Appeals relied, in part, on a course of dealing analysis in concluding that the Bank had a duty to consider the Badgetts' proposals. However, the cases cited in support of its conclusion are inapposite. In each of the cited cases, the court was asked to determine issues of waiver, interpretation, or modification of specific, express contract terms. *Central Wash. Prod. Credit Ass'n v. Baker,* 11 Wn. App. 17, 521 P.2d 226 (1974) (waiver of contract term requiring written consent before collateral was sold); *Dunn v. General Equities of Iowa, Ltd.,* 319 N.W.2d 515 (Iowa 1982) (waiver of right to enforce an acceleration clause in an installment note); *In re Samuels & Co.,* 526 F.2d 1238 (5th Cir.) (interpretation of sales provision), *cert. denied,* 429 U.S. 834 (1976); *Peck v. Augustin Bros. Co.,* 203 Neb. 574, 279 N.W.2d 397 (1979) (interpretation of sales provision); *Neal–Cooper Grain Co. v. Texas Gulf Sulphur Co.,* 508 F.2d 283 (7th Cir. 1974) (course of dealing is used to interpret contract term; further, no conflict existed between course of dealing and express terms of contract); *Luedtke Eng'g Co. v. Indiana Limestone Co.,* 740 F.2d 598 (7th Cir. 1984) (interpretation of provision establishing shipping requirements); *Farmers Elevator Co. v. Anderson,* 170 Mont. 175, 552 P.2d 63 (1976) (modification of original oral contract as to date of delivery).

Moreover, even if a course of dealing analysis was applicable, the express terms of the contract, which prevail over any inference based on a course of dealing, foreclose any finding that a duty to consider proposals exists. The agreement provides that "[a]dditional advances or increased commitments for any purpose [were] not contemplated" at the time the agreement was made. Clerk's Papers, at 134. Additionally, the agreement

merges all prior negotiations, interpretations and oral or written loan agreements between Borrower and Security State Bank and contains the entire loan agreement between Borrower and Security State Bank with respect to the loan

■ Finally, the Badgetts contend that a duty on the part of the Bank to consider their proposals may have arisen as a result of Cooke's promise to relay their proposal to the loan committee. However, the Badgetts acknowledge that their proposal was just that—a proposal, not an agreement—and further negotiations were necessary. Cooke's presentation to the loan committee was a step in the negotiation process. "[A]n agreement to do something which requires a further meeting of the minds of the parties and without which it would not be complete is unenforcible [sic]." *Sandeman v. Sayres*, 50 Wn.2d 539, 541–42, 314 P.2d 428 (1957); *accord, Wharf Restaurant, Inc. v. Port of Seattle*, 24 Wn. App. 601, 609, 605 P.2d 334 (1979). If Cooke's promise to negotiate is unenforceable, it follows that it cannot give rise to a contractual duty.

In sum, we hold that the implied duty of good faith in every contract did not give rise to a duty on the part of the Bank to consider the Badgetts' proposal. The duty arises, if at all, in connection with contract terms. The loan agreement did not obligate the Bank to consider the Badgetts' proposal. Because there is no duty to consider the proposal, the Bank is entitled to summary judgment as a matter of law. Accordingly, we reverse the Court of Appeals and reinstate the trial court's granting of summary judgment dismissing the Badgetts' claims.

The Court of Appeals did not directly address the trial court's order granting summary judgment in favor of the Bank on its counterclaims. However, the Badgetts acknowledge that their affirmative defenses to the counterclaims are based on the same facts and defenses as their claims against the Bank. There is no dispute as to the amount due and owing. Under their own analysis, dismissal of their damages claims necessarily leads to the granting of the

---

transaction. No amendment or interpretation of this Agreement shall be binding upon the Borrower or Security State Bank unless such amendment or interpretation is reduced to writing, signed by the parties and attached to this Agreement.

Clerk's Papers, at 135.

Bank's counterclaims. Thus, reversal of the Court of Appeals supports reinstatement of the trial court's orders on both summary judgment motions.

DORE, C.J., and UTTER, BRACHTENBACH, DOLLIVER, ANDERSEN, SMITH, and GUY, JJ., concur.

Reconsideration denied May 22, 1991.